NORTHERN NATURAL GAS COMPANY, Northern Gas Products Company, Northern Propane Gas Company, UPG, Inc., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF ENERGY, James R. Schlesinger, Secretary of the United States Department of Energy, David J. Bardin, Administrator of the Economic Regulatory Administration, Defendants.

Civ. A. No. 78–464.

United States District Court,
D. Delaware.

Jan. 12, 1979.

Stephen E. Herrmann, of Richards, Layton & Finger, Wilmington, Del., Richard G. Morgan, Donald S. Arbour, and Christina W. Fleps, of O'Connor & Hannan, Washington, D. C., F. Vinson Roach, Frank J. Duffy, and Michael P. Moran, of Northern Natural Gas Co., Omaha, Neb., for plaintiffs.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Barbara Allen Babcock, C. Max Vasanelli and Dina R. Lassow, U. S. Dept. of Justice, Don W. Crockett, Cliff G. Russell, James R. Myers and Michael P. Phillips, U. S. Dept. of Energy, Washington, D. C., for defendants.

OPINION

STAPLETON, District Judge:

This is a pre-enforcement review action challenging regulations recently promulgated by the Department of Energy ("DOE") pertaining to the pricing of natural gas liquids ("NGLs") and natural gas liquid products ("NGLPs").[1] Presently before the Court is a motion to preliminarily enjoin DOE from enforcing certain aspects of these new regulations, and from seeking penalties for non-compliance, pending final resolution of this case.

The plaintiffs are Northern Natural Gas Company ("Northern") and three of its wholly-owned subsidiaries, Northern Gas Products Company ("Northern Products"), UPG, Inc. ("UPG"), and Northern Propane Gas Company ("Northern Propane"). Northern, in addition to owning and operating an interstate natural gas pipeline system, owns and operates four gas processing plants for the extraction of NGLs from its gas stream. Northern sells approximately 98% of the NGLs and NGLPs which it produces to UPG. Northern Products' principal business is the operation of gas processing plants for the extraction of NGLs. Northern Products sells 99% of the NGLs and NGLPs which it produces to UPG. UPG markets an extensive line of petroleum products on a wholesale basis. Approximately 50% of these products are purchased from Northern and Northern Products, while the remainder comes from unaffiliated companies, including independent gas processors. Northern Propane is primarily a retail propane seller, although it also markets propane on a wholesale basis. It purchases 45% of its propane from independent processors, wholesale marketers and refiners, with the remainder coming from UPG. None of the plaintiffs refine crude oil.

The NGLs and NGLPs operations of plaintiffs are totally integrated and range from the initial production of NGLs to ultimate sales to consumers at the retail level.

---

1. 10 C.F.R. § 212.161, et seq., effective November 1, 1978. See 43 Fed.Reg. 42984 (September 21, 1978). NGLs are unfractionated streams which are extracted from natural gas; NGLPs are separate products such as propane, butane, and ethane produced by fractionating a natural liquid gas stream.

While the total operations of the plaintiffs are integrated, each individual plaintiff presently performs, and has historically and consistently performed, separate and distinct functions, even prior to the enactment of the Emergency Petroleum Allocation Act of 1973 ("EPAA").[2]

The central issue in this proceeding is whether the four plaintiffs are to be treated as one firm in applying the pricing rules of the DOE's pricing regulations or whether they are to be treated as separate entities according to their differing functions, i. e., Northern and Northern Products as gas plant operators, UPG as a wholesale marketer ("reseller" in the regulatory terminology), and Northern Propane as a wholesale and retail marketer ("reseller-retailer"). As will be seen hereafter, a great deal turns on the resolution of this issue, but some knowledge of the administrative proceedings leading up to the regulations which became effective November 1, 1978 is necessary to an understanding of its importance.

## I. THE REGULATORY BACKGROUND.

■ In 1970, Congress, pursuant to Section 203 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note ("Stabilization Act" or "ESA"), authorized the President "to issue such orders and regulations as he deems appropriate, . . . to . . stabilize prices, rates, wages, and salaries. . . ." Pursuant to the ESA, the Cost of Living Council ("CLC") adopted special regulations (Phase IV) applicable to the petroleum industry in August of 1973. 6 C.F.R. Part 150, Subpart L; 38 Fed.Reg. 22536 (August 22, 1973). In December of 1973, pursuant to the EPAA, the CLC authority over petroleum price controls was delegated to the new Federal Energy Office ("FEO").[3] With respect to petroleum prices, the FEO left the CLC's Phase IV petroleum price regulations essentially intact, incorporating them in 10 C.F.R. Part 212. The refiner price rules were recodified

as Subpart E of Part 212 of 10 C.F.R. ("Subpart E"). The provisions of Subpart E controlled the prices of NGLs and NGLPs produced both by refiners of crude petroleum and gas processors who did not refine crude petroleum. *Mobil Oil Corp. v. FEA,* 435 F.Supp. 983 (N.D.Tex.), *aff'd,* 566 F.2d 87 (Em.App.1977).

On September 6, 1974, the Federal Energy Administration ("FEA"), which had succeeded to the authority of the FEO in June of 1974, issued a Notice of Proposed Rulemaking for the purpose of considering an improved method of regulation for gas plant operations and the pricing of NGLs and NGLPs. 39 Fed.Reg. 32718 (September 10, 1974). The FEA, in its notice, recognized that the refiner price rules of Subpart E were not "well suited for regulating prices of liquid products produced from natural gas by gas processors, since the operations of a gas plant were quite different from those of a refiner." 39 Fed.Reg. 32719. To rectify the situation, the FEA proposed to promulgate a new Subpart K "designed specifically to cover the prices of natural gas liquids."[4]

In particular, the FEA sought to deal with the problem that most natural gas processors were essentially limited in sales of NGLs to their May 15, 1973 price levels. While the existing regulations permitted gas processors, as well as other refiners, to "pass through" increased product and nonproduct costs incurred since May 15, 1973, by adding such increases to their May 15, 1973 selling price in calculating their maximum lawful selling price, the regulated price of natural gas, their raw material, had remained level throughout the period. Crude oil refiners, on the other hand, had substantial product costs increases which they could pass through on the NGLs which they produced in the refining process. Among the concerns expressed by the FEA in proposing new regulations which would not so rigidly limit prices for natural gas

---

2. 15 U.S.C. § 751, *et seq.*

3. Executive Order No. 11748, 39 Fed.Reg. 33575 (December 6, 1973).

4. In addition to Subparts E and K, Subpart D pertained to crude oil producers, and Subpart F to resellers-retailers.

processors were the following: (1) supply shortages of NGLs and NGLPs, particularly propane, were being threatened or exacerbated as a result of prices being held down by the regulations, i. e., there was an inadequate financial incentive under the regulations for some natural gas processors to continue to extract the liquids from the gas stream; (2) prices for propane from gas processing plants were too low in relation to other fuels derived exclusively from crude oil which would very likely result in an excessive demand for propane, an already scarce commodity, especially from segments of the market not previously using propane, (e. g., as refinery fuel); and (3) the application of Subpart E to gas processors resulted in sharp differences in the maximum lawful prices which crude oil refiners and gas processors could charge for identical products (e. g., propane prices ranging from 5 to 28 cents per gallon), and these price disparities made it more difficult for gas processors to compete with the major crude oil refiners in the purchase of new gas producing properties to replace their constantly declining reserves. 39 Fed.Reg. 32718, *et seq.* (September 10, 1974). The Notice also recognized that prices of NGLs had historically had wide seasonal fluctuations and that May 15, 1973 prices "reflect lower summer prices which may not be fairly representative of the margins obtained" on an annual basis. The specific focus of the rulemaking identified in the notice was the need to fashion revised rules which would both ensure adequate supply and at the same time avoid unnecessary price increases.

Given these considerations, the FEA had tentatively concluded that a non-cost based increment to the May 15, 1973 prices of between 3 and 5 cents might be needed to assure adequate supplies of NGLs and NGLPs.

The Preamble to the proposal also said:

The special regulations being proposed in this notice for gas plants will also apply to gas plants owned or controlled by refiners, for purposes of determining the appropriate transfer price to the re-

finers. . . . The "special propane rule" (§ 212.83(c)(1)(iii)), as amended on August 5, 1974, is proposed to be kept in effect for refiners, except to the extent that the proposed new natural gas liquids price regulations would determine the transfer prices to refiners from affiliated gas plants.

39 Fed.Reg. 32720. The parties agree that in September of 1974 the FEA was proposing a Subpart K which would determine the transfer price for all transfers by gas plant operators, including those to affiliated firms. They differ, however, on whether this proposal was embodied in the original Subpart K regulations which were promulgated on December 19, 1974 and went into effect on January 1, 1975. *See* 39 Fed.Reg. 44407 (December 24, 1974).

The first section of Subpart K, now 10 C.F.R. § 212.161,[5] established its scope and relationship to other subparts. It provided, in part:

(a) *Scope.* This subpart applies to all sales of natural gas liquids and natural gas liquid products, including transfers between affiliated entities, by all firms, including gas plant operators, producers of natural gas, natural gas royalty owners, and refiners except sales by resellers or retailers, which are subject to Subpart F of this part.

(b) *Relationship to other Subparts —*

(1) *Gas plant operators.* Refiners that only refine liquid hydrocarbons from oil and gas field gases and do not refine crude oil shall determine their maximum lawful prices pursuant to this Subpart K and are not also subject to Subpart E.

(2) *Crude oil refiners which are also gas plant operators—(i) General.* Refiners that refine liquid hydrocarbons from oil and gas field gases, and also refine crude oil, shall determine their May 15, 1973 selling prices and increased costs for natural gas liquids and for natural gas liquid products produced in gas plants pursuant to this

---

**5.** Originally 10 C.F.R. § 212.141.

subpart, but shall determine their maximum lawful selling prices pursuant to Subpart E.

The Preamble to the new rules stated:

The new Subpart K of Part 212 adopted today applies to all sales other than resales of natural gas liquids and natural gas liquid products by all entities. . .

39 Fed.Reg. 44408.

With respect to the formula for the pricing of NGLs and NGLPs, the original Subpart K specified three components of the maximum allowable price for "first sales": a base, or "first sale" price; increased product costs; and increased non-product costs. The base price was the higher of (1) the weighted average of prices the gas processor received from different "classes of purchaser" on May 15, 1973; (2) an "adjusted first sale price" of 8.5 cents per gallon for propane, 9.0 cents for butane, and 10.0 cents for natural gasoline; and, where applicable, (3) a higher "imputed price" for NGLs from plants which were not constructed before, or which were significantly expanded after, Subpart K's effective date of January 1, 1975. "First sale" was defined in what is now 10 C.F.R. § 212.162 [6] as follows:

"First sale" means, with respect to natural gas liquids or natural gas liquid products, the first transfer for value to a class of purchaser for which a fixed price per unit of volume is determined.

The maximum lawful selling price could be in excess of the "base price" only if justified by certain increased "product" or "non-product" costs. Increased product costs were to include increases incurred since May 15, 1973, in the cost of purchased NGLs, the cost of purchased NGLPs, and the increased cost of natural gas "shrinkage" which results from the extraction of NGLs and NGLPs from the natural gas stream. The rules of Subpart K, unlike the refiner rules of Subpart E, did not delineate categories of non-product costs (e. g., labor, administrative, etc.) which could be recovered, but did set cumulative non-product cost increase ceilings of .375 cents per gallon for NGLs and .5 cents per gallon for NGLPs. There were no specific provisions for recovery of marketing costs, transportation costs or distribution costs. Nor was there a specific provision for the carry-forward or "banking" from month to month of increased non-product costs which could not be recovered in current prices due to market conditions. However, increased product costs were allowed to be "banked" for recovery in subsequent months. See the former 10 C.F.R. § 212.167(f).

All of the parties agree that so far as *unaffiliated* gas plant operators who do not also refine crude oil are concerned, maximum selling prices are determined solely under Subpart K of 10 C.F.R. § 212, and that so far as *unaffiliated* resellers and retailers are concerned, maximum selling prices are determined solely under Subpart F of 10 C.F.R. § 212. From the effective date of Subpart K, plaintiffs have read Section 212.161 to require exactly the same treatment for gas plant operators who were selling to affiliated resellers and for resellers and retailers who were buying from affiliated processors. Thus, Northern and Northern Products have treated their sales to UPG as first sales using the "adjusted" May 15, 1973 first sale prices, or in the case of new facilities, the "imputed" May 15, 1973 first sale prices. UPG and Northern Propane calculated their maximum lawful selling prices under Subpart F pursuant to what they considered to be the mandate of Section 212.161(a).

In early 1976, an FEA auditor asserted that Northern and its three subsidiaries were a single firm subject solely to Subpart K. Under this "single firm" view, UPG and Northern Propane are considered to be part of a gas plant operator governed by Subpart K and there is no "first sale" until there is a sale to an unaffiliated third party. On February 10, 1976, Northern and its subsidiaries requested an interpretation

---

6. Originally 10 C.F.R. § 212.142.

from the FEA's Office of General Counsel.[7] There has not as yet been a response to this request.

In October of 1976, the FEA published "A Pricing Guide for Natural Gas Processors", which was intended to aid natural gas producers "in understanding and complying with FEA regulations on the pricing of Natural Gas Liquids . . . and NGL products." It commenced:

> The pricing regulations outlined in Part 212, Subpart K apply to *any firm involved in the first sale of natural gas liquids and natural gas liquid products, including transfers between affiliated entities.* Firms which are affected include gas plant operators, producers of natural gas, natural gas royalty owners, and refiners. Sales by resellers and retailers are not subject to this Subpart, as they are covered under Subpart F of Part 212.
> . . . (Emphasis supplied)

On June 3, 1977, FEA proposed to amend Subpart K in several respects. *See* 42 Fed. Reg. 29490 (June 9, 1977). The major changes discussed in its Notice of Proposed Rulemaking, published on June 9, 1977, concerned gas processors' calculations of increased non-product costs. Specifically, FEA proposed, *inter alia,* to remove previous ceilings on the recovery of increased non-product costs, to define categories of allowable non-product costs, and to provide explicitly for the banking of unrecovered non-product cost increases.

The FEA also proposed in that notice, however, "[t]o clarify, on a prospective basis and without prejudice to a later determina-

tion regarding the appropriate treatment of past practices that . . . Subpart K is exclusively applicable to all of the operations, including marketing operations, of all gas processors that do not refine crude oil, regardless of whether such operations are conducted directly by the gas processor or through a separate corporate entity." 42 Fed.Reg. 29491.[8] To accomplish this prospective "clarification", the FEA proposed to add a new definition of "firm"—a term previously undefined in Subpart K—which would include a processor and all of its affiliated companies as one "firm."[9] On July 29, 1977, plaintiffs submitted comments urging that such action not be taken.

On September 14, 1978, DOE, which had succeeded to the authority of the FEA, issued a final rule amending Subpart K. *See* 43 Fed.Reg. 42984 (September 21, 1978). The amendments, effective November 1, 1978, promulgated certain proposed modifications in Subpart K's treatment of increased non-product costs and also effected several other major alterations in Subpart K. A definition of firm, which is somewhat different from the proposed definition, was added to Subpart K with the comment that the inclusion of the definition "has always been implicit in Subpart K." 43 Fed.Reg. at 42994 (September 21, 1978).[10] DOE also devoted ten columns of its preamble to a discussion of "transfer pricing" (i. e. the use of Subpart K's adjusted first sale price in transfers of NGLs and NGLPs from a gas processor to an affiliated marketing entity), concluding that to make "explicit" what had always been "implicit," the phrase "including transfers between affiliated enti-

---

7. The Request raised three issues: (1) whether Northern and its subsidiaries should be treated as separate and distinct firms for pricing purposes; (2) whether Northern and Northern Products should be treated as gas plant operators subject to Subpart K pricing; and (3) whether UPG should be treated as a reseller and Northern Propane as a reseller-retailer, both subject to the price rules of Subpart F.

8. The sole exception to this proposed clarification was the situation where the affiliated marketer did not purchase more than 5% of its product from the affiliated processor.

9. The proposed definition of firm found in the June 9, 1977 notice stated:

> "Firm" means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls, except to the extent that independent firms having an interest in the same gas plant or gas plants or in the production from such plant or plants are treated as "related entities" under the provisions of this Subpart.

10. "Firm" is defined in 10 C.F.R. § 212.162, as follows:

> "Firm" means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.

ties" was being deleted from the Scope section, Section 212.161(a). Following publication of the new rules, plaintiffs filed this action contesting only the two last mentioned changes.

On October 30, 1978, the date this action was filed, the DOE, pursuant to a number of requests, filed a "Suspension of Effective Date of Amendment" regarding the deletion of the phrase "including transfers between affiliated entities" from 10 C.F.R. § 212.161(a). *See* 43 Fed.Reg. 50841 (October 31, 1978). At the same time, DOE noticed a hearing for December 7, 1978 to receive comments on whether "the prohibition of transfer pricing under Subpart K should be eliminated or modified."

The DOE stated that it was adhering to its "position that the prior regulations did not permit transfer pricing." The notice went on to state that "accordingly, neither the amendment deleting this phrase nor the suspension of the effective date of this amendment represents a substantive change." 43 Fed.Reg. 50843. The other modifications of Subpart K, including the addition of the "firm" definition, remain in effect.

Plaintiffs are requesting the Court to preliminarily enjoin (1) enforcement of that portion of the amendments to Subpart K prohibiting Northern and Northern Products from transfer pricing in their sales of NLGs and NGLPs to UPG, (2) enforcement of that portion of the amendments to Subpart K which defines "firm" so as to affect the method by which UPG and Northern Propane may determine their prices for NGLPs, and (3) the defendants from seeking civil or criminal penalties against the plaintiffs for their pricing of NGLs and NGLPs after November 1, 1978, the effective date of the Subpart K Amendments.

## II. THE EFFECTS OF THE SINGLE FIRM APPROACH.

### A. *August 1973 to November 1, 1978.*

As noted above, since the inception of mandatory petroleum pricing regulations in

August of 1973,[11] Northern and Northern Products have treated their sales to UPG as "first sales," using the adjusted May 15, 1973 first sale prices, as provided in 10 C.F.R. § 212.164. During that period, UPG and Northern Propane have calculated their maximum lawful selling prices under Subpart F.

As reflected in the Preamble to the new regulations and the October 30, 1978 Suspension, DOE maintains that the single firm concept has always been a part of Subpart K. It follows, under that view, that transfers between affiliated firms have never been recognized as "first sales" for pricing purposes and that the maximum selling prices for affiliated retailers and resellers have been governed by Subpart K since its adoption.

If the DOE's position on the meaning of Subpart K prior to the November 1, 1978 amendments is correct, the plaintiffs have over-priced during the period from August of 1973 to October 31, 1978, and have "banked" non-existent increased costs. This is so for a number of reasons.

First, if "adjusted" or "imputed" first sale prices were not available for use by affiliated firms until a sale to a third party, as a practical matter they were of no benefit to plaintiffs since accumulated costs by the time of a sale by a marketer are such that UPG's and Northern Propane's actual May 15, 1973 selling prices were in excess of the "adjusted" and "imputed" first sale prices. The actual May 15, 1973 sale prices of processors, on the other hand, were generally lower than the "adjusted" or "imputed" first sale prices, and in the case of Northern and Northern Products, the actual May 15, 1973 selling prices were much lower for each of the regulated products. Thus, when Northern and Northern Products utilized "adjusted" or "imputed" first sale prices in determining their selling prices to UPG they received a benefit to which they

---

11. Although Subpart K did not become effective until January 1, 1975, it was applied retroactively from August 19, 1973, the date when CLC's Phase IV regulations became effective. *See* 40 Fed.Reg. 30824 (September 4, 1975).

were not entitled under the single firm view.

In addition, although both Subpart K and Subpart F provided a tripartite pricing formula consisting of a May 15, 1973 base price, plus increased product costs and increased non-product costs incurred since May 15, 1973, the methods of calculation of these price components differed substantially between the two subparts. First, increased *product* costs under Subpart K were, and still are, determined by comparing current and May 1973 costs of *purchased products,* while increased product costs under Subpart F are determined by comparing current and May 1973 costs of product *in inventory.*[12] Second, while there is debate between the parties on the point, Northern maintains that if UPG is treated as a part of a processor under Subpart K, the effect of one section of that Subpart is to deny UPG and Northern Propane credit for increased product costs which they in fact incurred in purchases of NGLs from unaffiliated firms and in fact passed through.[13] Third, before November 1, 1978, the two subparts had afforded different treatment for increased non-product costs: Subpart K has recognized only increased *processing* costs as increased non-product costs which could be reflected in NGL and NGLP prices, while under Subpart F increased non-product costs include those costs involved in *marketing* NGLs and NGLPs. Moreover, Subpart K during this period had a .5 cent per gallon limit on increased non-product costs which was not found in Subpart F.

### B. *The Prospective Effects.*

The November 1, 1978 amendments effectively eliminated the differences between Subparts K and F in treatment of non-prod-

uct cost increases. The differences in the methods of computing increased product costs remain, however. Due to the new "firm" definition of 10 C.F.R. § 212.162, UPG and Northern Propane must compute their increased product costs pursuant to Subpart K.

In addition, as previously noted, the new "firm" definition of 10 C.F.R. § 212.162 prohibits Northern and Northern Products from using the first sale prices provided for in 10 C.F.R. § 212.164 in computing the maximum allowable selling price for their sales to UPG.

### III. THE PLAINTIFFS' ARGUMENTS.

### A. *August 1973 to November 1, 1978.*

Plaintiffs view the November 1, 1978 regulations and their preamble as an attempt by DOE retroactively to impose the single firm concept upon the regulations that controlled pricing of NGLs and NGLPs from their effective date to November 1, 1978. They argue that the DOE is without authority to legislate retroactively under the circumstances of this case and that, even if it were so authorized, the regulations are invalid as retroactively applied since the DOE gave no notice that it was considering retroactive imposition of a single firm concept and, accordingly, there was no opportunity for comment thereon.

Plaintiffs ask for a declaratory judgment that their pricing practices during this period were in accordance with the applicable law. At this preliminary injunction stage, however, plaintiffs seek no relief with respect to the period before November 1, 1978.[14]

---

12. Since in May of 1973, inventory prices were lower than current prices, there has generally been a larger amount of increased product costs allowed under Subpart F than under Subpart K.

13. *See* 10 C.F.R. § 212.167(c). As noted above, both UPG and Northern Propane purchased substantial amounts of NGLs and NGLPs from unaffiliated firms.

14. At an earlier stage of this case, the plaintiffs asked the Court to preliminarily enjoin the defendants from bringing enforcement proceedings against them for their pricing activities prior to November 1, 1978. In a letter dated November 15, 1978, I informed the parties that I would decline to enjoin such proceedings because the threat of such a proceeding does not constitute a threat of irreparable harm.

### B. The Prospective Operation Of The November 1978 Regulations.

Plaintiffs seek *pendente lite* relief from the prospective operation of the November 1, 1978 regulations on four grounds. First, they assert that the effect of 10 C.F.R. § 212.167(c) is to deprive UPG and Northern Propane of their right under the EPAA to recover all of their product costs and that this regulation is, accordingly, invalid.

Second, it is argued that the DOE gave no notice prior to promulgating the regulation that it was considering the transfer pricing issue and, accordingly, that the regulations were adopted in violation of Sections 4(b) and (c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b), (c), Section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1), and Section 7(i)(1)(B) and (C) of the Federal Energy Administration Act ("FEAA"), 15 U.S.C. § 766(i)(1)(B), (C). Third, plaintiffs contend that the challenged portions of the November 1978 regulations are violative of Section 10(e) of the APA, 5 U.S.C. § 706, because they are arbitrary and capricious. Finally, it is urged that the new regulations discriminate against affiliated gas processors and resellers without a rational basis, presumably in violation of the Due Process Clause of the Fifth Amendment.

### IV. RIPENESS.

■ DOE contends that this case is not "ripe" for judicial review under the standard set forth by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Association, Inc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). *See also A. O. Smith Corp. v. FTC*, 530 F.2d 515 (3d Cir. 1976). In deciding whether a case is "ripe" for judicial resolution, it is necessary to evaluate

. . . both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner, supra*, 387 U.S. at 149, 87 S.Ct. at 1515.

This Court has recently confronted the issue of ripeness in a context similar to the one now before the Court. *See Phillips Petroleum Co. v. FEA*, 435 F.Supp. 1239 (D.Del.1977), *aff'd* (Em.App.1978). In *Phillips*, Chief Judge Latchum set forth the criteria for deciding whether judicial resolution is appropriate, under the trilogy of Supreme Court cases cited above:

These cases hold that a controversy is ripe for pre-enforcement judicial relief if an affirmative answer can be given to the following four questions: (1) are the issues presented purely legal, (2) are the issues based on final agency action, (3) does the controversy have a direct and immediate impact on the plaintiff's business, and (4) is the litigation calculated to expedite final resolution rather than delay or impede effective agency enforcement?

435 F.Supp. at 1245. I am convinced that, under the test set forth in *Phillips*, this action is ripe for judicial resolution.[15]

■ First, as the statement of plaintiffs' arguments in the preceding section indicates, the issues presented in this case are purely legal issues concerning the validity and proper interpretation of various pricing regulations. Second, the regulations controlling the pricing issues raised here constitute final agency action, pursuant to Section 10 of the Administrative Procedure Act, 5 U.S.C. § 704. The regulations were promulgated after notice and comment procedures, and the parties agree that absent judicial intervention, the regulations are final, binding and enforceable against the plaintiffs. While the DOE has recently held a hearing to reconsider the transfer pricing issues, *see* 43 Fed.Reg. 50842 (October 31, 1978), the mere possibility that DOE might change its regulations at some future

---

**15.** At oral argument, DOE's counsel conceded that on the ripeness issue, this case is indistinguishable from *Phillips*. Transcript of oral argument of November 9, 1978, p. 54.

date does not make the present regulations any less final. Thus, unless this Court hears this case, "legal questions will be left unadjudicated while the regulations will still apply with full force and effect. These issues are fit for judicial decision." *Phillips, supra,* (Slip Opinion, p. 19).

 The test of hardship is also satisfied in this case. The issues raised here have a direct and immediate impact upon the pricing of NGLs and NGLPs by each of the plaintiffs. The plaintiffs are threatened with a daily dilemma in their pricing policies. If they do not comply with the new regulations, they risk substantial civil and criminal penalties. On the other hand, if plaintiffs do comply with the regulations, the result, as is detailed more fully hereafter, will be substantial reductions in profits, and in the case of one plaintiff (Northern Propane), a negative profit situation. In short, these regulations place the plaintiffs in a very real dilemma regarding the operations of their day-to-day business affairs. *A. O. Smith, supra,* at 524. This impact favors judicial resolution of the issue.

Finally, litigation of the pricing issues in this Court will not delay or impede effective agency enforcement. While DOE argues that the plaintiffs should mount their initial challenge to the regulations as part of an administrative enforcement proceeding, the fact remains that no such proceeding has been instituted against the plaintiffs. There is no reason why the plaintiffs, who are presently affected by the regulations, must await further agency action before challenging the regulations. In addition, the final resolution of this action may well expedite any agency action. If the plaintiffs ultimately prevail here, the need for an agency enforcement action will be narrowed substantially, and possibly eliminated. If DOE prevails here, the judgment against the plaintiffs will be binding upon them in any other proceeding. While DOE

contends that the plaintiffs must first challenge the regulations in an agency enforcement action, it has not suggested any cogent reasons why that procedure would be more efficient, or why this action will delay or impede any action it desires to institute.

Since all of the appropriate criteria are met, I conclude that the issues raised by the plaintiffs in this action are ripe for judicial resolution.

## V. THE AVAILABILITY OF PRELIMINARY RELIEF.

 The considerations which a court must take into account in determining whether to grant preliminary injunctive relief are well established. They are (1) the threat of irreparable injury to the plaintiff in the event that interim relief is denied, (2) possibly injury to other parties in the event that such relief is granted, (3) the public interest, and (4) the likelihood of plaintiff's ultimate success on the merits. *Delaware River Port Authority v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 919–920 (3d Cir. 1974); *A. O. Smith Corp. v. FTC, supra,* at 525; *GTE Sylvania, Inc. v. Consumer Product Safety Commission,* 404 F.Supp. 352, 369 (D.Del.1975). When a balancing of the first three of these factors strongly favors a plaintiff, his burden as to the fourth is lessened. *Elco Corp. v. Microdot, Inc.,* 360 F.Supp. 741 (D.Del.1973).

### A. *Injury To The Plaintiffs.*

 In an earlier Opinion in this case, dated November 20, 1978, I denied the plaintiffs' motion for preliminary relief because the record showed that the plaintiffs had substantial "banks" of unrecovered increased costs.[16] Given those banks, the record did not indicate that the profits which plaintiffs would lose as a result of compliance during the pendency of this litigation would be anything more than paper losses.

---

**16.** Under the Subpart K regulations in effect prior to November 1, 1978, banking of increased product costs by gas processors was permitted pursuant to 10 C.F.R. § 212.167(f). Northern and Northern Products had accumulated banks under that section. Retailers and

resellers subject to Subpart F are permitted to bank increased product costs pursuant to 10 C.F.R. § 212.93(e). UPG and Northern Propane had accumulated banks by pricing under Subpart F.

The Court recognized at that time, however, that if DOE's interpretation of the Subpart K regulations prior to November 1, 1978, regarding the "single firm" issue were correct, plaintiffs' banks might in fact be substantially smaller than the record reflected at that time, or perhaps even non-existent. Since that time, the plaintiffs have developed the record on the level of their banks if the DOE's position is correct, and have renewed their motion for interim relief.

The affidavits submitted by the plaintiffs reveal the following information. If each of the plaintiffs complies with the new Subpart K regulations, they will lose approximately the following amounts in revenue annually:

| | | |
|---|---|---|
| Northern | – | $ 2,500,000 |
| Northern Products | – | $15,600,000 |
| UPG | – | $ 7,000,000 |
| Northern Propane | – | $11,000,000 |

In addition, the affidavits show that compliance would force Northern Propane into a negative profit situation.

The affidavits also show that as of October 31, 1978, the plaintiffs had banks of unrecovered increased product costs in the following amounts:

| | | |
|---|---|---|
| Northern | – | $30,536,000 |
| Northern Products | – | $77,465,000 |
| UPG | – | $23,426,000 |
| Northern Propane | – | $12,669,000 |

If the plaintiffs were able to draw upon these banks in order to sell their products at prices in excess of the maximum lawful selling prices under the new Subpart K regulations during the pendency of this litigation, there would be no threat of lost profits, and accordingly, no irreparable injury to the plaintiffs from compliance.

If the DOE's interpretation of the regulations in existence from their inception until November 1, 1978 is correct, however, plaintiffs' banks are non-existent. The record shows that if Northern and Northern Products had not used the "first sale" price in their sales to UPG prior to November 1, 1978, and if UPG and Northern Propane had priced pursuant to Subpart K, rather than Subpart F prior to November 1, 1978, that the revenues of each plaintiff, for the period from August of 1973 to October of 1978, would have been decreased by the following amounts:

| | | |
|---|---|---|
| Northern | – | $12,760,000 |
| Northern Products | – | $81,504,000 |
| UPG | – | $30,381,000 |
| Northern Propane | – | $53,691,000 |

Thus, the record shows that if the single firm concept has always been implicit in Subpart K, as DOE maintains, and the amounts by which the plaintiffs' prices exceeded the maximum lawful selling prices for their products were now deducted from their banks, none of the plaintiffs except Northern would have a bank. Moreover, if the banks are governed by the single firm concept, the four plaintiffs had a total bank of $144,096,000, and total overcharges of $178,336,000. The overcharges therefore would exceed the accumulated banks by more than $34 million, entirely eliminating those banks.

Given these facts, it is apparent that plaintiffs cannot disimpale themselves from the horns of their dilemma by the expedient of maintaining existing price levels and relying on their banks to justify the differential between those prices and the maximum allowable prices under the new Subpart K. Like a decision to disregard the new regulations altogether, that course holds a threat of steadily accumulating civil and criminal penalties. This threat can be avoided only by plaintiffs reducing their prices to a level which will comply with the new Subpart K. As noted above, this would mean a total overall loss of revenue to the plaintiffs of more than $30 million, and a negative profit situation for Northern Propane.

In opposing the plaintiffs' motion, DOE makes a number of arguments why there is no irreparable injury to the plaintiffs flowing from the regulations. First, DOE argues that the future loss of revenues claimed by the plaintiffs UPG and Northern Propane is speculative because the plaintiffs cannot show that the differential between the future average cost of product in inventory and the May 1973 average cost of product in inventory will be any greater than the differential between the future

average cost of product purchased and the May 1973 average cost of product purchased.[17] It follows, DOE argues, that UPG and Northern Propane cannot establish that their increased product costs under Subpart F would be greater than under Subpart K, and thus cannot show that the maximum lawful selling price under the Subpart F formula would be any higher than that under the Subpart K formula.

While plaintiffs cannot, of course, foretell the future, their affidavits do show the relationship during the last year between maximum lawful selling prices calculated under the two subparts and make reasonable projections about that relationship in the future. These affidavits show that Northern Propane's average maximum lawful selling price under Subpart F was 5.198¢ per gallon higher than under Subpart K for the period June 1—November 30, 1978, and that UPG's average maximum lawful selling price under Subpart F was 1.303¢ per gallon higher than under Subpart K for the same period. Second, plaintiffs' affidavits show that assuming (1) historical sales volumes remain the same in the future, and (2) market conditions strengthen moderately as expected, Northern Propane's profit margin will decline by approximately $11 million next year, and UPG's profit margin will decline by approximately $7 million next year as a result of the new regulations.

Next, DOE claims that the record shows only that the maximum lawful selling prices will have to be reduced, and not that the actual market prices will be altered. DOE points to the large banks accumulated by the plaintiffs in the past to support its contention that the plaintiffs would not be able to pass through the additional increased product costs, even if they were to price under Subpart F. However, the plaintiffs' affidavits show that the average prices currently charged by the plaintiffs for NGLs and NGLPs exceed the maximum lawful selling prices allowed under the new Subpart K. It follows that in order to comply with Subpart K, plaintiffs will have to reduce their actual selling prices, and not just the maximum lawful selling prices.

The DOE also asserts that, even if it is reasonable to expect substantial revenue loss during the pendency of this case, it does not follow that the injury is irreparable. It acknowledges that, if plaintiffs prevail, DOE will be unable to recoup their losses from those who paid the reduced price, but points out that plaintiffs could institute an "exception proceeding" before the DOE and seek an opportunity to recover their lost revenues through future "make-up" adjustments in their maximum allowable prices. I am unpersuaded, however, that an exception proceeding holds assurance that plaintiffs will be made whole. First, *retroactive* relief has been granted in the past by the DOE only upon a showing of such severe financial hardship as to preclude the petitioning party from continuing its essential operations.[18] In addition, the nature of plaintiffs' attack is such that they are unlikely to prevail with respect to the post-November 1978 period without also prevailing with respect to the pre-November 1978 period. Thus, if they prevail, plaintiffs will have substantial banks and since there is a limit to what the market for NGLs and NGLPs will bear, it is not clear that "make-up" adjustments will be of material benefit to plaintiffs.

Finally, DOE maintains that even if the plaintiffs will lose millions of dollars of revenue as a result of compliance with the new Subpart K regulations, that does not meet the irreparable injury requirements set forth by the Third Circuit in *A. O. Smith Corp. v. FTC, supra.*

In *A. O. Smith,* in the context of compliance costs averaging $50,000 per plaintiff, the Third Circuit stated:

17. As discussed earlier, under Subpart F the base price and increased product costs are determined by reference to the average cost of product in inventory at the relevant time. Subpart K, however, looks to the average cost of products purchased at the same points in time.

18. *Butler Aviation Int'l., Inc.,* 3 FEA ¶ 80,584 (February 24, 1976); *C & H Refinery, Inc.,* 3 FEA ¶ 80,532 (December 15, 1975).

Without intending to disparage the importance of such an injury, we observe that all that is lost is profits. Any time a corporation complies with a government regulation that requires corporate action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the principle of equity that the threatened injury must be, in some way, "peculiar."

I do not read the *A. O. Smith* case to suggest that lost profits can never constitute irreparable injury. Indeed, the majority opinion implicitly rejects that view by noting that it should not be necessary to demonstrate "a corporate liquidity crisis or significant changes in company operations" before being entitled to *pendente lite* relief.[19] The Court reached the conclusion it did in *A. O. Smith* because it viewed the asserted harm as a part of the normal cost of doing business in today's world of government regulation, rather than something "peculiar" in the life of the plaintiffs. In this case, the projected lost revenues are sufficiently significant in terms of plaintiffs' business life that they can accurately be characterized as "peculiar". This is most obvious in the case of Northern. Propane, which compliance will relegate to an overall loss situation.

I conclude that the supplemented record does indicate a probability of the kind of irreparable loss which is a prerequisite for preliminary injunctive relief.

While I am convinced that the plaintiffs will suffer irreparable harm resulting from compliance with the "firm" definition of Subpart K, and the pricing requirements entailed, as discussed above, I do not believe

that there is any threat of irreparable harm to the plaintiffs arising from 10 C.F.R. § 212.167(c). As earlier noted, the insertion of a single firm definition in Subpart K results in UPG and Northern Propane having to determine their prices under that Subpart rather than under Subpart F. According to UPG and Northern Propane, Section 212.167(c) of Subpart K would require them, in determining their increased product cost of NGLs acquired from *independent* gas plant operators, to exclude "those amounts attributable to the use by the seller of an adjusted May 15, 1973 selling price." This, it is said, would violate Section 4(b)(2)(A) of the EPAA[20] by foreclosing UPG and Northern Natural from passing through substantial out-of-pocket costs which they are required to pay.

I do not understand the DOE to dispute that the new regulations would violate the statute if they had the effect which plaintiffs ascribe to them. It insists, however, that the operation of Section 212.167 is "applicable only to pricing NGLs (the mixed liquid stream) in the limited situation in which a gas producer or processor sells the liquids to an unaffiliated processor to be fractionated into NGL *products*" and is designed "to insure that the adjustment to the May 15, 1973 price may be made only once at the producer-processor level."[21] Thus, Section 212.167(c) is not in the DOE's view "applicable to resellers or retailers of NGL *products* such as UPG and Northern Propane. . . . "

Given the clear and unqualified position taken by the DOE with respect to the limited scope of its regulations, I am unable to say that UPG and Northern Propane are currently under a threat of irreparable injury by virtue of the operation of Section 212.167(c) and will deny the relief sought with respect to that section on that ground.

19. 530 F.2d at 527, n. 9a.

20. Section 4(b)(2)(A) of the EPAA, 15 U.S.C. § 753(b)(2)(A) provides, in part:
 (2) In specifying prices (or prescribing the manner for determining them), the regulation under subsection (a) of this section—
 (A) shall provide for dollar-for-dollar pass-through of net increases in the cost of crude

oil, residual fuel oil, and refined petroleum products at all levels of distribution from the producer through the retail level;

21. Defs. Memo. in Opposition to Renewed Motion for Preliminary Injunction p. 7. *See also* Transcript of Oral Argument of November 9, 1978, pp. 67–8.

### B. *Adverse Effects Of A Preliminary Injunction.*

The DOE asserts that a preliminary injunction would be detrimental to the interests of UPG's and Northern Propane's customers and would not serve the public interest.

UPG's and Northern Propane's customers would be adversely affected by a preliminary injunction. They would be deprived of the opportunity to pay lower prices during the pendency of the suit. Their situation is a considerably more favorable one than plaintiffs would occupy if relief is denied, however, since all parties agree that any overpayment by customers can and will be restored to them if plaintiffs lose.

With respect to the public interest, I am unpersuaded that it would be materially affected one way or the other by a preliminary injunction in this case.

### C. *The Likelihood Of Success On The Issues Relating To The Prospective Effect Of The November 1978 Regulations.*

#### 1. *The procedural deficiency issue.*

■ The procedural requirements of the APA apply to DOE rulemaking.[22] In particular, the APA requires DOE to provide notice of proposed rulemaking. Such notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."[23] Once notice is given, the APA mandates that DOE "give interested persons an opportunity to participate in the rule making through sub-

mission of written data, views, or arguments with or without opportunity for oral presentation."[24] Additional procedural requirements applicable to DOE rulemaking are contained in the FEAA and the DOE Act.[25] For present purposes, however, reference to the APA will suffice.[26]

Plaintiffs concede that notice of the proposed rulemaking was given in the Federal Register on June 9, 1977, 42 Fed.Reg. 29490 (June 9, 1977). They do not argue that opportunity for comment contemplated by the APA and FEAA was not provided. Nevertheless, they assert that the procedure utilized was fatally flawed by the failure to give notice that transfer pricing would be a subject of consideration during the proceedings. I assess the plaintiffs' chances of success on this issue to be slim.

The June 1977 notice contained a proposed regulation defining the word "firm" to include "a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls. . . ." As plaintiff has subsequently acknowledged in this case,[27] the effect of inserting that definition in Subpart K would clearly be to outlaw transfer pricing between affiliated firms. As a result, the comments from industry members included arguments for and against transfer pricing. Indeed, as the preamble to the final regulations demonstrates, most of the contentions made by plaintiffs in this litigation were advanced by commenters in response to the June 1977 notice. *See* 43 Fed.Reg. 42994–42996 (September 21, 1978). Accordingly, a holding

---

**22.** Section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1), incorporates by reference § 207(a) of the Economic Stabilization Act, 12 U.S.C. § 1904 note, which provides:

The functions exercised under this title are excluded from the operation of subchapter II of chapter 5, and chapter 7 of title 5, United States Code [subchapter II of chapter 5, and chapter 7 of title 5], except as to the requirements of sections 552, 553, and 555(e) of title 5, United States Code [sections 552, 553, and 555(e) of title 5].

**23.** 5 U.S.C. § 553(b)(3).

**24.** 5 U.S.C. § 553(c).

**25.** *See* 15 U.S.C. § 766(i)(1)(B), (C).

**26.** For a detailed comparison of the notice requirements of the APA and FEAA *see Shell Oil Company v. FEA*, 440 F.Supp. 876, 881–2, n. 25 (D.Del.1977), *aff'd.* 574 F.2d 512 (Em.App. 1978).

**27.** When the DOE suspended the effectiveness of its deletion of the phrase "including transfers between affiliated entities" from 10 C.F.R. § 212.161(a), but left the definition of "firm" in full effect, plaintiffs were quick to point out to this Court, "Insertion of that definition in Subpart K operates alone to bar transfer pricing." Pl. Reply Memo. Docket # 11, p. 7.

that the notice was inadequate appears to me unlikely.

## 2. *The Section 10(e) issue.*

Section 10(e) of the APA, 5 U.S.C. § 706, provides that a "reviewing court shall hold unlawful and set aside agency action . . found to be arbitrary, capricious . . . ." According to plaintiffs, the November 1, 1978 regulations should be set aside under this section insofar as they require a single firm approach and bar transfer pricing, because no rational basis for the regulations was articulated by the DOE at the time of their promulgation. A review of the preamble to these regulations,[28] however, suggests that plaintiffs are unlikely to be successful with this contention.

Along with the comments on whether the preexisting regulations permitted transfer pricing and whether in any event, it would not be wise to do so, the DOE also received comments on whether affiliated resellers and retailers were or should be governed by Subpart K or Subpart F. The preamble summarizes and evaluates these comments at some length and then sets forth the agency's own analysis of the preexisting regulation. This legal analysis refers to the historical context in which the old regulations had been adopted, points to language in those regulations which it deemed to be indicative of the presence of the single firm concept and inconsistent with transfer pricing, suggests an interpretation of Section 212.161(a) which it considered to be consistent with its views, and notes that under an interpretation of those regulations which permitted transfer pricing, methods would be available for affiliated entities to cir-

cumvent or undermine the basic objectives of the pricing regulations.[29]

The conclusions reached by the DOE with respect to the single firm and transfer price issues are for the most part summarized in the following paragraphs of the Preamble:

> We conclude that the provisions of the prior regulations may not properly be construed as providing for a transfer price. Moreover, we do not believe that there is adequate information upon which we could adopt a transfer pricing provision in this proceeding and also treat gas processors uniformly and fairly. However, we do recognize that the policy arguments for the express recognition of a transfer price merit further analysis. We will consider adopting a transfer pricing (or "plant gate" pricing) provision if such a provision would treat gas processors uniformly regardless of their organizational form, would not unduly increase NGL prices, and would also insure against any abuses by firms.

> \* \* \* \* \* \*

> b. *Amendments adopted today.* To make explicit what has always been implicit in the regulations, and to prevent any further alleged confusion, we today adopt a definition of "firm" in § 212.162 and delete from § 212.161(a) the words "including transfers between affiliated entities." The definition of firm includes a parent and all consolidated and unconsolidated entities which it directly or indirectly controls. The definition is identical to that in subpart E.

> It is possible that we may propose at least a limited form of plant gate [i. e. transfer] pricing in the future. Informa-

---

**28.** 43 Fed.Reg. 42984–42999 (September 21, 1978).

**29.** The DOE reasoned in part:

> Moreover, the argument that § 212.161(a) recognizes a "transfer price" between affiliated entities proves too much. Not only would transfers between a particular gas processing entity and an affiliated reselling entity qualify for the transfer price, but also transfers between two affiliated gas processing entities would qualify for the same treatment. It would also require the shifting back

and forth between subparts F and K where a "reseller" purchases NGL's, and "sells" them to an affiliated gas plant entity for fractionation, which then "sells" the fractionated products to yet another affiliated reseller. Such a situation would result in potentially absurd regulatory hopscotching, and it is thus apparent that an unqualified "transfer price" rule could open the door to many possible "layering" abuses in a variety of similar situations. . . .
43 Fed.Reg. at 42995.

tion currently available to us indicates that the majority of gas processors are not currently using a transfer price, so that maintaining the status quo for the time being should not generally disrupt pricing in the NGL industry. In proposing any plant gate price provision, we will be especially concerned with assuring equality of treatment among gas processors, regardless of the particular form of organization employed, and the economic impact of allowing plant gate pricing. Further, if any form of transfer pricing is proposed it will be under appropriate safeguards to assure that firms do not insert marketing affiliates which serve no economic purpose into their chain of distribution solely to create "paper costs."

43 Fed.Reg. at 42995–6.

Plaintiffs maintain that there is no rational basis articulated for the DOE's action because (1) the DOE's legal analysis of the old regulations is erroneous, and (2) the likelihood of abuse occurring under a transfer pricing system is "never substantiated." [30] I believe this argument loses sight of the nature of the administrative process.

Plaintiffs have ample ammunition for their contention that the single firm concept is not implicit in the old regulations and that transfer pricing was permitted under those regulations as properly construed. Their argument assumes, however, that a showing of a likelihood of success with respect to the proper construction of the regulations in effect prior to November 1, 1978 constitutes a showing of a likelihood of success with respect to a stay of the prospective operation of the new regulations. This assumption, in my judgment, is in error.

When the DOE made its final decision regarding the 1978 amendments, it was not initiating a regulatory program; it was in mid-stream, administering an ongoing scheme under which the industry was making daily decisions. The core issue confronting it, insofar as this case is concerned, was whether all firms under common control would be treated as one entity or whether separate corporate entities would be recognized and regulated according to their differing functions. There was a debate in the industry over which choice had been made in the existing regulation. Some in the industry were treating their affiliated firms as separate entities and were utilizing transfer pricing; others were following a single firm approach. Under these circumstances, the DOE decided that the matter should be clarified. It made its choice between the two approaches by deciding that the status quo should be maintained, at least until more information could be gathered and the matter studied further. It determined the status quo by analyzing its existing regulations and by referring to the practices of gas processors under those regulations.

 This is not an unreasonable basis of decision for an agency to use in resolving a debate about the effect of its regulations. Nor does it become an unreasonable basis of decision if a reviewing court, at some point thereafter, disagrees with the agency's legal analysis of the prior regulation. The authority of an agency to interpret existing law is an essential element of any regulatory scheme as complex as that entrusted to the DOE. Where that authority is exercised through a reasoned analysis, prospective rules promulgated on the basis of that analysis cannot fairly be characterized as arbitrary and capricious and should not be disturbed by a reviewing court. Accordingly, I believe it will be plaintiffs' burden in this case, insofar as prospective relief is concerned, to show not merely that the DOE's analysis was erroneous, but also that it was irrational (i. e. frivolous) or advanced in bad faith.

While the DOE's position with regard to the pre-November 1978 regulations may be in error, it appears to me at present to be a litigable one. Although the wording of Section 212.161(a) prior to November 1, 1978 appears to be an express endorsement of transfer pricing, acceptance of that con-

**30.** Plaintiffs' Brief, Docket # 7, p. 57.

struction is not without its problems in the context of the regulations as a whole,[31] and I am unwilling to say that Section 212.-161(a) left no room for argument.

As far as possible abuse under a transfer pricing system is concerned, it must be remembered that the DOE, in fashioning a rule for the future, was exercising a legislative function. It was not necessary that past abuses be established as a matter of fact. It is sufficient that the agency's concern about manipulation of the system through multiple corporate entities is not an unreasonable one.

Given what I believe to be the applicable legal standards, the present record does not persuade me that plaintiffs' Section 10(e) argument is likely to be a successful one.

### 3. *The discrimination issue.*

█ In their final argument, plaintiffs correctly point out that the new regulations treat affiliated corporate entities differently than independent ones. It is also true that in the four areas pinpointed by plaintiffs they would be economically better off if they were treated in the same fashion as independents.[32] As plaintiffs recognize, however, there is nothing unlawful about a regulatory agency treating differently situated parties differently. They assert, nevertheless, that the agency "must . . always make certain that the differences in treatment are rationally founded to avoid the charge of arbitrary discrimination."[33]

I do not interpret this attack to be different in substance from plaintiffs' arbitrary

and capricious attack; nor do I assess its likelihood of success to be different. So long as there is a rational basis for the agency's decision to treat firms under common control as one entity and the effects of that decision do not violate the statute or other applicable law, I do not believe it is necessary for an agency to demonstrate that all such effects are wise or even "fair" in relationship to the regulation of independent firms.

### VI. CONCLUSION.

If preliminary relief is denied, it is reasonable to expect that plaintiffs will suffer irreparable injury during the pendency of this litigation in the form of substantial and unrecoverable lost revenues. While these losses will be limited by virtue of the fact that the issues presented should be capable of prompt resolution on the merits, this Court would be disposed to grant *pendente lite* relief if there appeared to be a substantial chance that the November 1, 1978 regulations ultimately will be declared invalid. Plaintiffs' position with respect to this portion of their case[34] does not impress the Court as being one of substance, however, and for that reason, their motion for a preliminary injunction will be denied.

---

**31.** If one accepts plaintiffs' construction of Subpart K and reads Subpart F literally, for example, there are no pricing regulations applicable to an affiliated marketer who purchases more than 5% of its product from its affiliated gas processor. *See* 10 C.F.R. §§ 212.91 and 212.31. Thus, it seems to me that any resolution of the legal issues presented by the pre-November 1978 regulations will involve harmonizing provisions, which, on the surface at least, are not entirely consistent.

**32.** Plaintiffs assert that the new regulations unfairly discriminate between affiliated processors and independent processors by denying the former the benefit of the "adjusted" and "imputed" base prices and by possibly increasing the amount the former will have to pay

under "net-back" agreements. The discrimination against affiliated marketers is said to exist by virtue of Section 212.167(c) and the limitation, prior to November 1, 1978, of the non-product cost pass through to $.005 per gallon under Subpart K.

**33.** *Hill v. Federal Power Commission,* 335 F.2d 355 (5th Cir. 1964), cited in Plaintiffs' Brief, p. 42, Docket # 7.

**34.** As earlier noted, the matter presently before the Court requires no consideration of the likelihood of plaintiffs' success on the issues related to the period from August 1973 to November 1, 1978, and I express no opinion thereon.