**PENNZOIL COMPANY, Plaintiff,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary, Department of Energy, Defendants.**

Civ. A. No. 78–335.

United States District Court,
D. Delaware.

Feb. 20, 1979.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John P. Mathis, and Randolph Q. McManus, Baker & Botts, Washington, D. C., James W. Shaddix, and Jay G. Martin, Pennzoil Co., Houston, Tex., for plaintiff.

James W. Garvin, Jr., U. S. Atty., John H. McDonald, Asst. U. S. Atty., Wilmington, Del., Paul Wallach, Office of General Counsel, Dept. of Energy, George Kielman and Dean S. Cooper, Office of Special Counsel, Dept. of Energy, Washington, D. C., for defendants.

## OPINION

STAPLETON, District Judge:

Plaintiff Pennzoil Company ("Pennzoil") brought this action against the Department of Energy ("DOE") for a judicial determination of the validity of DOE Ruling 1975–15. (40 Fed.Reg. 40832, September 4, 1975). Jurisdiction is predicated on Section 211 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note at § 211, as incorporated in Section 502(a) of the Department of Energy Organization Act, 42 U.S.C. § 7192; and 28 U.S.C. §§ 1331, 1337, 2201 and 2202. Before the Court is the DOE's motion to dismiss the complaint on the grounds that Pennzoil has failed to exhaust available administrative remedies and that the complaint does not present a case or controversy ripe for adjudication.

## I. BACKGROUND FACTS.

Under federal price control regulations applicable to crude oil producers, crude oil ceiling prices are determined by reference to historical and current levels of production from a given "property." The quantity of crude oil produced from a property in the designated base year is established as the "base production control level" ("BPCL"). All production at or below the property's BPCL is deemed "old" oil, while quantities of crude oil produced in excess of a property's BPCL qualify as "new" oil. "Old" oil is subject to a lower tier price, and "new" oil qualifies for a higher price.

The regulatory definitions of "property" and "BPCL" have remained essentially unchanged since they were first adopted and published on August 23, 1973 (38 Fed.Reg. 22536). "Property" is defined as "the right to produce domestic crude oil, which arises from a lease or from a fee interest." 10 C.F.R. § 212.72, 41 Fed.Reg. 4931 (February 3, 1976).[1] Until February 1, 1976, the "BPCL" of a property for a particular month was determined by reference to "the total number of barrels of domestic crude petroleum produced and sold from that property in the same month of 1972 . . . ." 6 C.F.R. § 150.354, 38 Fed.Reg. 22536, 22538 (August 22, 1973). Effective February 1, 1976, an updated base period based on the average production of "old" oil during each month of 1975 was authorized. 10 C.F.R. § 212.72.

Ruling 1975–15 was issued on August 29, 1975 to address "those cases where, due to . . . a change [in ownership] or restructuring [of the right to produce crude oil] since 1972, an interpretation of the definition of 'property' is required for proper

---

[1] That definition is a slight change from the prior definition of "property" as "the right which arises from a lease or fee interest to produce domestic crude oil." 6 C.F.R. § 150.-354(b)(2).

application of the price rules in determining BPCL." 40 Fed.Reg. 40832 (September 4, 1975). Ruling 1975–15 stated that "a unit agreement signifies one right to produce crude oil arising from several leases or fee interests" and that "*the unit defines the property.*" 40 Fed.Reg. 40832 (September 4, 1975). Ruling 1975–15 thus required that amounts of "old," "new," and "released crude oil" [2] be calculated with reference to a single BPCL for the unit.

A "unit agreement" is an agreement between various leaseholders or royalty owners to consolidate the operations of their leases or fee interests into one unit. This is done in an effort to increase the total amount of crude oil that can be recovered from the unit. Secondary enhanced recovery operations are undertaken. For example, some of the producing wells in the reservoir may be shut in, others turned into injection wells, and gas injected into the crude oil reservoir to increase the reservoir pressure. The resulting production is apportioned to each of the participating leases in accordance with a formula established in the unitization agreement.

The preamble to new crude oil pricing regulations promulgated on February 1, 1976 modified Ruling 1975–15 to require producers in a unit to establish a unit BPCL at such time as the unit experienced a "significant alteration of producing patterns," but no later than the date of the implementation of enhanced recovery operations. Section 212.75 of the regulations was specifically applicable to enhanced recovery units. That section stated that an enhanced recovery unit need not be treated as a single property with a unitwide BPCL until the date of implementation of "enhanced recovery operations on a unit or as of the date production patterns with respect to individual leases within a unit are significantly altered (whichever date occurs first). . . ." 41 Fed.Reg. 4931, 4941 (February 3, 1976), as amended, 10 C.F.R. § 212.75(b), 41 Fed.

Reg. 36173, 36184 (August 26, 1976).[3] "Significantly altered" was defined as follows:

"Significant alterations in producing patterns" means the occurrence of either (1) the application of extraneous energy sources by the injection of liquids or gases into the reservoir, or (2) the increase of production allowable for any property that constitutes the unitized properties.

10 C.F.R. § 212.75(b), 41 Fed.Reg. 36173, 36184 (August 26, 1976). The BPCL for such units was to be computed based on the twelve-month period immediately preceding the date on which the unit was to be accorded single-property status under the above criteria.

Ruling 1977–2 was issued on January 25, 1977. 42 Fed.Reg. 4409 (January 25, 1977). It stated that Section 212.75 did not apply retroactively to enhanced recovery units that were required to determine a unit BPCL prior to February 1, 1976. Such units, according to Ruling 1977–2, must compute a BPCL according to Ruling 1975–15, as modified by the preamble to the February 1, 1976 amendments.

Pennzoil Producing Company, a wholly owned subsidiary of Pennzoil, operates and has an ownership interest in the Walker Creek field, which was unitized on May 1, 1974. Prior to unitization, the Walker Creek field consisted of wells drilled on each of thirty-nine tracts. Each tract was treated as a separate property with a BPCL based on 1972 production. After unitization, Pennzoil continued to calculate and certify volumes of "old," "new," and "released" crude oil as it had prior to unitization.

Injection operations at the Walker Creek Unit began on March 18, 1975.

From May 1, 1974 through August 31, 1975, the total production from the Unit was lower than the aggregate production from the tracts in the Unit prior to unitiza-

---

**2.** Prior to February, 1976, *see* 10 C.F.R. § 212.-74, for each barrel of "new" oil produced in a particular month, a producer was entitled to "release" a barrel of "old" oil at the "new" oil price.

**3.** The original regulation used the word "substantially" instead of "significantly."

tion. Nevertheless, Pennzoil's use of individual BPCL calculations for each property within the Unit resulted in Pennzoil claiming volumes of "new" and "released" oil for that period.

On September 1, 1975, Pennzoil adopted a single BPCL for the Walker Creek Unit. As a consequence, from September 1, 1975 through January 31, 1976, no new oil was claimed from the Unit.

In accordance with the definition of "BPCL" set out in 10 C.F.R. § 212.72, Pennzoil continues to employ a BPCL based on its certifications of "old" oil for each month of 1975. For the first eight months of that year, Pennzoil used the volume of "old" oil previously certified on an individual tract basis. For the last four months, Pennzoil certified the volume of "old" oil on a unit-wide basis.

## II. PENNZOIL'S CLAIMS.

In the present action, Pennzoil seeks to have Ruling 1975–15 declared invalid. Pennzoil attacks the Ruling on both substantive and procedural grounds: it argues, first, that the Ruling is inconsistent with the underlying regulation [4] it is intended to interpret and, second, that the Ruling had so much of an impact on the industry that it should not have been promulgated without notice and an opportunity for comment. If the Ruling is found valid, Pennzoil argues that it cannot be applied retroactively. Pennzoil seeks a judgment from the Court declaring that (1) prior to the issuance of Ruling 1975–15, Walker Creek was not required to aggregate its tracts for purposes of determining its BPCL; (2) Ruling 1975–15 is invalid; (3) Section 212.75 and its preamble are invalid and void as applied to units established prior to February 1, 1976; (4) if Ruling 1975–15 is valid, then it may not be applied to the Walker Creek Unit for the period prior to the issuance of Ruling 1977–2 on January 2, 1977; and enjoining the DOE from proceeding with any administrative action with respect to the Walker Creek Unit based on a claim that Pennzoil

was required to comply with Ruling 1975–15.

The DOE contends that Pennzoil's claims are not ripe for adjudication at this time and that they should be dismissed because Pennzoil has not exhausted its administrative remedies.

## III. RIPENESS.

The DOE argues that Pennzoil's claims are not ripe for judicial resolution until they have been presented to the agency and that, therefore, Pennzoil's claims do not present a "case" or "controversy" cognizable by this Court under Article III, Section 2 of the United States Constitution.

■ In the administrative law context, a claim is ripe for pre-enforcement judicial consideration only if: (1) the issues presented are purely legal, (2) the issues arise out of final agency action, (3) the controversy has a direct and immediate impact on the plaintiff's business, and (4) the litigation will expedite final resolution rather than delay or impede effective agency enforcement. *Phillips Petroleum Company v. Federal Energy*, 435 F.Supp. 1239 (D.Del.1977), aff'd. sub nom. *Standard Oil Company v. Department of Energy*, 596 F.2d 1029 (Em. App.1978); *see Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); *Northern Natural Gas Company, et al. v. Department of Energy*, 464 F.Supp. 1145 (D.Del.1979).

■ (1) The DOE argues that the issues raised by Pennzoil's complaint require extensive factual, as well as legal, determinations. It argues that, for the Court to resolve this controversy, it would have to determine what the BPCL on the Walker Creek Unit should have been at all times relevant to this controversy. That determination, the DOE argues, is precisely the kind of factual determination best suited to the exercise of agency expertise. As I un-

4. 10 C.F.R. § 212.72.

derstand Pennzoil's claim, however, Pennzoil does not challenge the application of Ruling 1975–15 to the Walker Creek Unit if the Ruling is found valid;[5] it challenges only the validity of the Ruling, a purely legal question. The question of the validity of the Ruling will turn on whether the Ruling's definition of a unit as a property is consistent with the definition of "property" as a right "which arises from a lease or from a fee interest" set out in Section 212.-72. To conclude that the Ruling is invalid, whether on substantive or procedural grounds,[6] I will necessarily have to conclude that the Section 212.72 definition of "property" permitted the determination of a BPCL on a lease-by-lease basis prior to September 1, 1975, as Pennzoil did.[7] The record in this case reveals no factual controversy over Pennzoil's computation of its BPCL for the Walker Creek Unit assuming computation was permitted on a lease-by-lease basis. But even if it did, that factual controversy does not involve Ruling 1975–15 and is severable from the issue tendered in this case.

(2) The DOE argues that because Ruling 1977–2 specifically invited interested parties to come before the agency for a case-by-case determination of the correct date on which to determine the BPCL on a unit-wide basis,[8] the agency action is not final. Pennzoil does not contest the method for establishing the unified BPCL date under Ruling 1975–15, however. Rather, it contests the DOE's authority to require a unitized BPCL at all. The DOE clearly has taken a final position with respect to its authority to require one BPCL per unit. It issued a Notice of Probable Violation on January 10, 1978 to Exxon Company, USA, Case No. 630R00125, on the basis of Ruling 1975–15 and it filed a complaint in federal district court against Exxon on the same basis.[9] In a formal interpretation issued to Mobil Oil Company, the DOE stated that Ruling 1975–15 retroactively requires the establishment of a unit BPCL for units formed prior to February 1, 1976. In response to an application filed by Pennzoil with the DOE for rescission of Ruling 1975–15 or for proposed rulemaking, the Acting General Counsel of the DOE stated that it was not considering rescission or modification of Ruling 1975–15. Indeed, the DOE conceded at oral argument that the DOE's position was final with respect to the validity and retroactive application of Ruling 1975–15. I conclude, therefore, that the issues presented to this Court by Pennzoil arise out of final agency action.

(3) I likewise conclude that the "hardship" on Pennzoil arising out of this controversy is no less than the hardship found to exist in *Abbott Laboratories, supra,* and *Phillips, supra.* Here, as in those cases, the plaintiff's day-to-day pricing decisions will be substantially affected by the resolution of this controversy. Pennzoil currently prices its crude oil on the basis of a September 1, 1975 unitwide BPCL date. If Ruling 1975–15 validly applies retroactively, then Pennzoil is in daily violation and is subject to substantial penalties for each violation,[10]

---

5. Pennzoil concedes that, if the Ruling is found valid, it will be appropriate for Pennzoil to go through agency channels to determine the correct application of the Ruling to the Walker Creek Unit.

6. Pennzoil's substantive and procedural attacks on the Ruling both require a determination whether the Ruling is inconsistent with the underlying regulation.

7. Actually, Pennzoil determined its BPCL on the basis of 39 tracts, each of which were subject to two or more leases, but the complaint alleges that "the designation of each tract as a separate property did not alter the calculation of 'new' oil that would have been achieved if a BPCL were assigned to each indi-vidual lease in the Walker Creek field." Paragraph 18 of the Complaint.

8. FEA will . . . on a case-by-case basis, permit unit operators to justify the establishment of the date of significant alteration in producing patterns in such units *on reasonable bases other than those specified by the present definition.*

23 Fed. Energy Guidelines (CCH) ¶ 16,066 at 16,204 (emphasis added).

9. *United States of America v. Exxon Corporation,* 462 F.Supp. 378 (D.D.C.1979).

10. The civil penalties could amount to "$20,000 for each violation," 10 C.F.R. § 205.203(b)(1)(i), and the FEA takes the position that "[e]ach day

as well as substantial civil liability. The DOE argues that Pennzoil made its own bed when it adopted its present course of pricing conduct without first resorting to the administrative process to determine the propriety of its conduct. Having made its bed, the DOE argues that Pennzoil cannot claim hardship for purposes of establishing this Court's jurisdiction. Had Pennzoil submitted to the administrative process, however, and adopted a pre-September 1, 1975 unitwide BPCL date, it would have been required to certify a greater volume of "old" oil for the period covered by the unitwide BPCL than it did. Accordingly, Pennzoil's present pricing would be based on a higher BPCL and Pennzoil would be losing substantial revenues, should the ruling ultimately be found invalid. I conclude that the day-to-day affect on Pennzoil's business satisfies the third requirement for a finding of ripeness.

(4) As previously noted, a resolution of Pennzoil's claims in this litigation necessitates a determination whether Section 212.-72 permitted the computation of a BPCL on a lease-by-lease basis. If the Court concludes that Ruling 1975–15 is invalid, it necessarily will conclude that Section 212.72 permits lease-by-lease BPCL computation and this will resolve the present controversy between the parties.[11] If the Court concludes that Ruling 1975–15 is valid, but that it cannot be applied retroactively, then the controversy likewise will be resolved, since it will be clear that Pennzoil's adoption of a unitwide BPCL on September 1, 1975 complies with the Ruling. Only if the Ruling is held valid with retroactive effect will the parties need to go through the administrative process of determining the proper date for establishing the unitwide BPCL. Even in that case, however, the agency will have the benefit of a court determination of the validity of its ruling. In short, resolving the issue of the validity of the Ruling will aid the enforcement of the underlying regulation.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES.

The DOE contends that Pennzoil has not exhausted its administrative remedies because it has not pursued the exception or interpretation proceedings provided by the agency, as it was invited to do by Ruling 1977–2.

Section 504 of the Department of Energy Organization Act, 42 U.S.C. § 7194 (Supp. 1977), requires that the agency:

by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, or rescission of, exception to, or exemption from, such rule, regulation or order. [The agency] shall additionally insure that each decision on any application or petition requesting an adjustment shall specify the standards of hardship, inequity, or unfair distribution of burden by which any disposition was made, and the specific application of such standards to the facts contained in any such application or petition.

The DOE has established procedures for agency consideration of grievances. Exception procedures are established in 10 C.F.R. § 205.50, *et seq.* Section 205.50(a)(1) provides in pertinent part:

This subpart establishes the procedures for applying for an exception from a regulation, ruling or generally applicable requirement *based on an assertion of serious hardship or gross inequity.* . . .

(emphasis added). By its terms, the procedure provides a means of *specific* relief from the *general* applicability of a regula-

---

that a violation . . . continues shall be deemed to constitute a separate violation. . . ." *Id.* § 205.203(a)(2); S.Conf.Rep.No. 94–516, 94th Cong., 1st Sess. 200–01 (1975).

**11.** If Pennzoil's reading of the regulations is ultimately sustained and a controversy arises about Pennzoil's application of the lease-by-

lease BPCL concept, as a result of an audit or otherwise, that controversy can be resolved in an administrative proceeding. Absent a judicial determination, however, the DOE will not administratively make such a determination because, in its view, that issue is not relevant to Pennzoil's current pricing.

tion or ruling. Thus, it provides no means of attacking the general applicability, or validity, of the agency action. It is the latter that the plaintiffs seek to do in this action. As this Court has held in the DOE context, "[w]here the legal issues [which are ripe for determination before the Court] will not be considered in exception proceedings, exhaustion of those proceedings is not required." *Phillips, supra*, at 1248.

The DOE also provides procedures whereby interpretations of rulings and regulations may be obtained. 10 C.F.R. § 205.80, *et seq.* Section 205.84(b)(1) provides that:

> The FEA shall base an interpretation on the FEAA and EPAA and the regulations and *published rulings* of the FEA as applied to the specific factual situation.

(Emphasis added). Thus, by its terms, the Section requires the agency to accept the challenged Ruling as valid and limit its inquiry to the application of the Ruling to the particular factual situation. Because the interpretation procedure assumes the validity of the Ruling, it is clear that the issue of the validity of the Ruling would not be considered in a proceeding under Section 205.84(b)(1). Because the issue Pennzoil seeks to have adjudicated could not be addressed in either an interpretation or an exception proceeding, it will not be required to exhaust those proceedings before coming to Court.

Furthermore, none of the policies behind the exhaustion doctrine will be advanced by application of the doctrine to this case. Although the doctrine of exhaustion of administrative remedies is not addressed to the jurisdiction of the trial court, as is the question of ripeness, *see, e. g., Hayes v. Secretary of Defense*, 169 U.S.App.D.C. 209, 515 F.2d 668 (1975), *Kale v. United States*, 489 F.2d 449 (9th Cir. 1973), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220 (1974), the policies underlying the doctrine are similar to those underlying the ripeness doctrine. *Standard Oil Company v. FEA*, 440 F.Supp. 328 (D.Ohio 1977); *see Phillips Petroleum Company v. FEA*, 435 F.Supp. 1239 (D.Del.1977); *National Automatic Laundry & Cleaning Council v. Shultz*, 143

U.S.App.D.C. 274, 443 F.2d 689, 700 (1971). The doctrine is primarily designed to serve the purposes of ensuring the development of a full factual record before decision, allowing for the application of administrative expertise to the factual record as developed, and promoting judicial efficiency in the resolution of controversies. *See Phillips, supra*, at 1248. None of those purposes would be served by application of the doctrine to the present case.

As stated earlier, the plaintiff does not contest the applicability of Ruling 1975–15 to the Walker Creek Unit if the Ruling is, in fact, valid. It is attacking solely the underlying validity of the Ruling, which is purely a legal question. Nor does it require administrative expertise to determine the underlying validity of the Ruling. Finally, requiring the plaintiff to pursue the administrative remedies before prosecuting this action would not be efficient. Until the validity or invalidity of the ruling is determined, it is futile for the agency to expend its time and resources applying the Ruling to the specific factual situation of Walker Creek.

I conclude that the present action is not barred by Pennzoil's failure to pursue the DOE interpretation or exception proceedings.

## CONCLUSION

The complaint in this action presents a controversy that is ripe for adjudication and the policies behind the exhaustion doctrine would not be served by requiring Pennzoil to pursue the administrative remedies of the DOE before pressing its controversy here. Therefore, the DOE's motion to dismiss the complaint will be denied.