**DERBY & CO., INC. and Phibro Corporation, Plaintiffs,**

v.

**DEPARTMENT OF ENERGY and James B. Edwards, Secretary of Energy, Defendants.**

**No. 81 Civ. 0250 (CBM).**

United States District Court, S. D. New York.

Aug. 25, 1981.

Cahill, Gordon & Reindel, William E. Hegarty, George Wailand, Thomas R. Jones, Andrew L. Deutsch, Susan E. Fine, New

York City, Bracewell & Patterson, by John R. Cope, William V. DePaulo, Washington, D.C., for plaintiffs.

John S. Martin, Jr., U. S. Atty., J. D. Pope, Asst. U. S. Atty., New York City, for defendant U. S. Dept. of Energy.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Currently before the court are a motion to dismiss by defendant, the United States Department of Energy (DOE), and a cross motion for summary judgment by plaintiffs, Derby & Co., Inc. (Derby) and Phibro Corp. (Phibro). For the reasons given below, the court concludes that jurisdiction may not properly be exercised over this action at this time. Accordingly, DOE's motion to dismiss the complaint is granted.

### The Facts

Broadly speaking, this action involves a controversy over to what extent, if any, DOE may regulate the purchase and sale by American companies of certain petrochemicals outside the borders of the United States. As necessary background to the court's discussion, three matters will be described in some detail: (1) certain relevant statutes and DOE regulations, (2) recent actions by DOE which have precipitated this law suit, and (3) plaintiffs' allegations as stated in their complaint.

### (1) Relevant Statutes and Regulations

In 1973 Congress enacted the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 et seq. (1976), as amended (EPAA). EPAA directed the president to promulgate regulations governing the allocation and prices of crude oil and various refined petroleum products. See 15 U.S.C. § 753(a). The jurisdictional reach of these regulations was defined as "all crude oil, fuel oil, and refined petroleum products produced in or imported into the United States." Id.

The president established the Federal Energy Office (FEO)[1] which adopted existing petroleum price regulations[2] that had been promulgated by the Cost of Living Council (CLC) pursuant to The Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (1976) (ESA). The FEO was subsequently replaced by the Federal Energy Administration pursuant to the Federal Energy Administration Act, 15 U.S.C. § 761 et seq. (1976 and Supp. III 1979) (FEAA), which was in turn replaced by the Department of Energy (DOE) pursuant to Department of Energy Organization Act, 42 U.S.C. § 7101 et seq. (Supp. III 1979) (DOEOA).

The regulations originally adopted by the FEO from the CLC applied by their own terms "to each sale or purchase of a covered product in the United States except as provided in subpart C." 10 C.F.R. § 212.2. In turn, Subpart C provides in pertinent part that the "prices charged for imports, but only the first sale into U.S. commerce, are exempt." 10 C.F.R. § 212.53(b). Finally, it must be kept in mind that the court's entire discussion concerns the impact of a regulatory scheme which is no longer in effect because the President has recently issued an Executive Order rescinding all oil pricing and allocation regulations. See 46 Fed. Reg. 9909 (Jan. 30, 1981).

### Administrative Interpretations by DOE

At the heart of this controversy stand two administrative decisions by the DOE Office of Exceptions and Appeals (OEA), A. Johnson & Co., 3 FEA ¶ 80,546 (CCH) (OEA January 16, 1976) (A. Johnson) and Energy Cooperative, Inc., 5 DOE ¶ 82,534 (CCH) (Office of Hearings and Appeals March 6, 1980) (ECI). These two decisions provide the framework for this litigation. The court proposes to examine them in some detail because the court's disposition of the instant case flows directly from its interpretation of these two actions by DOE.

Utilizing a procedure available under DOE regulations,[3] A. Johnson & Co., Inc. (A. Johnson), a United States corporation,

---

1. Exec. Order N. 11748, 3 C.F.R. 822 (1971–75 Comp.).

2. 39 Fed.Reg. 744, 761 (Jan. 2, 1974).

3. See 10 C.F.R. § 205 Subpart F.

asked for an opinion from DOE's general counsel as to whether certain transactions were subject to DOE pricing regulations. The transaction for which an interpretation was requested involved the purchase of naphtha from Compagnia Shell de Venezuela (Compagnia Shell) by an unincorporated foreign office of A. Johnson. The purchase took place in Venezuela. A. Johnson then resold the naphtha to Trans Ocean Petroleum, Inc. (Trans Ocean), another United States corporation. This transaction also took place in Venezuela. Trans Ocean then imported the naphtha into this country and sold it to Pace Oil Co. (Pace) in Wilmington, Delaware. Plaintiffs have provided a useful diagram of this transaction which is reproduced in the margin.[4]

In considering the series of transactions just described, the general counsel framed the issue to be decided as: "Which, if any, of these transactions is subject to FEA price regulations?" 42 Fed.Reg. at 23739. He then concluded that the sale from Trans Ocean to Pace was subject to regulation, but the other transactions were not. A. Johnson then appealed to the FEA Office of Exceptions and Appeals (OEA), seeking a ruling that the Trans Ocean-Pace sale was the exempt "first sale" for purposes of 10 C.F.R. § 212.53(b).

OEA rejected A. Johnson's position, and affirmed the general counsel. OEA reasoned that the "first sale" into U.S. commerce was the sale from A. Johnson to Trans Ocean, which made the sale from Trans Ocean to Pace a "wholly domestic transaction." *A. Johnson & Co., supra,* 3 FEA at p. 80697. The OEA then discussed the operation of the "first sale" exemption at some length as the exemption applied to oil trading outside the boundaries of the United States. The OEA reasoned as follows:

In view of the issues which Johnson raises in the present case, we have determined that the Interpretation should be modified to take into account additional factors which have an important bearing on the factual issue of whether the covered products which a firm purchases outside the territorial limits of the United States are destined for importation into the United States.

If a firm that is domiciled in the United States purchases an allocated product outside the United States a rebuttable presumption will be established that the firm is purchasing the goods for importation into the United States. Consequently, the last sale of the goods prior to their arrival in an American port will generally be the "first sale into U.S. commerce" as that term is used in 10 CFR 212.53(b). As a result the price established in the sale pursuant to which the goods arrive at an American port is subject to the FEA Mandatory Petroleum Price Regulations. The presumption that allocated products which an American-domiciled firm purchases abroad are destined for importation into the United States may however be rebutted by a showing that the past operating history of the firm indicates that a substantial portion of the allocated product or products which it purchases have in fact not been imported into the United States. The burden of making the showing necessary to rebut the presumption rests with the firm.

*A. Johnson & Co., supra,* 3 FEA at p. 80,698.

The second DOE decision at the heart of this litigation is *Energy Cooperative, Inc.,* 5 DOE ¶ 82,534 (CCH) (Office of Hearings and Appeals March 6, 1980) (*ECI*). *ECI* involved allocation and exception relief

**4.** 

| Situs of Transaction | Parties |
|---|---|
| | Compagnia Shell (a foreign corporation) |
| Venezuela | |
| | A. Johnson (a United States corporation) |
| Venezuela | |
| | Trans Ocean (a United States corporation) |

| Situs of Transaction | Parties |
|---|---|
| Venezuela | Trans Ocean (a United States corporation) |
| | IMPORT |
| United States | |
| | Pace (a United States corporation) |

granted to a small independent refiner owned and operated by a number of agricultural cooperatives in the midwest. On September 12, 1979, ECI filed an Application for Exception and Petition for Special Redress with the OHA. After holding hearings, OHA issued an order providing for a temporary exception for ECI from DOE's oil entitlement program,[5] and also providing for allocation of oil to ECI under the DOE Buy/Sell program.[6] This allocation was to have been supplied by the Permian Corporation (Permian), a wholly owned subsidiary of Occidental Petroleum Company (Occidental). OHA then conducted further hearings to enable it to issue a final order. OHA then issued a final Order, and it is that decision which is now the focus of the present controversy.

Obviously, the primary focus of *ECI* is an attempt to determine whether ECI was entitled to the relief it sought. For our purposes, however, the most relevant portions of the *ECI* decision involve OHA's discussion of whether DOE possessed the authority necessary to order Occidental and Permian to supply oil to ECI. This question arose because of the structure of the commercial relationship between ECI and Occidental. According to Occidental, ECI historically purchased Libyan crude oil from Occidental f.o.b. Libya. ECI then took delivery of the crude in Libyan ports, and transported the crude back to the United States. Occidental therefore took the position that DOE lacked "the authority to govern sales of foreign crude oil and that the OHA therefore cannot attempt to control the disposition of the Libyan crude oil in question." *ECI, supra,* 5 DOE at p. 85,149. In response ECI argued that the Libyan oil sales were subject to DOE jurisdiction either because sufficient statutory authority did exist, or because DOE could simply disregard Occidental's corporate structure since Permian was a wholly owned subsidiary and view Occidental as engaged in sales of both foreign and domestic crude oil.

The OHA begins its treatment of the question before it with the following introduction:

In view of the conclusion previously reached that exception relief imposing a supply obligation on Occidental or its subsidiaries should not be granted, it is unnecessary to resolve fully the issues raised by the parties as to the extent of the DOE's regulatory authority. Nevertheless, we acknowledge that Occidental may be correct that the EPAA does not grant the DOE jurisdiction over a wholly foreign transaction such as, for example, a domestic firm's acquisition of crude oil from a foreign producer.

*ECI, supra,* 5 DOE at p. 85,150.

With the gaping qualification that the entire subsequent discussion was *dicta,* the OHA then discussed possible circumstances under which DOE might extend its regulatory authority to cover oil transactions which took place outside the United States. It quoted the same portion of *A. Johnson* which this court has reproduced above. The OHA then made the following observation:

Thus, the application of the first sale exemption by the Cost of Living Council and its successor agencies does not depend upon where a particular transaction occurs but rather focuses upon the initial acquisition of a foreign product by a U.S. purchaser. Although *Johnson* states that the first sale into U.S. commerce is generally the last sale prior to arrival of the product in an American port, this need not always be the case. Once a first sale into U.S. commerce occurs, subsequent sales of the product may be subject to the price regulations regardless of where they take place.

5 DOE at p. 85,851.

Focusing on the facts before it, the OHA then observed that "a strong argument might be made" for reaching Occidental's sales to ECI under the analysis of *A. Johnson* due to the particular relationship between Occidental and the Libyan govern-

---

5. *See* 10 C.F.R. § 211.67.

6. *See* 10 C.F.R. § 211.65.

ment. Apparently the Libyan oil now being marketed by Occidental was originally discovered by another wholly owned Occidental subsidiary, Occidental of Libya, Inc. (Oxylibya), which was nationalized by the Libyan government in 1973. This nationalization resulted in a complex arrangement whereby Oxylibya would be able to purchase a certain amount of crude oil for a certain period at an agreed upon price. This oil is then marketed by yet another wholly owned Occidental subsidiary, Occidental Crude Sales. Given these peculiar circumstances, the OHA reasoned that the exempt "first sale" for purposes of DOE's regulations might be the transfer of crude from the Libyan government to Oxylibya, providing this transfer could be construed as a "sale." This would then result in the subsequent transfer from Oxylibya to ECI being subject to regulation by DOE.

The tentativeness of the OHA's discussion is obvious from the nature of the factual assumptions which the discussion necessitated. First, the OHA noted that it did not in fact have the "details regarding the activities of Occidental Crude Sales or the manner in which the crude oil sold to ECI is transferred from Oxylibya to Occidental Crude Sales." 5 DOE at p. 85,152. Second, the OHA was unwilling to say whether the transfer of crude oil from the Libyan government to Oxylibya was in fact a "sale" for the purposes of DOE regulations. *Id.* Assuming such a transfer was a sale for regulatory purposes, it then "could constitute the first sale into U.S. commerce," which would then subject the "subsequent sale of the crude oil to ECI" to DOE regulation. *Id.* The OHA ended this section of the *ECI* opinion by assuming that Occidental's activities in Libya were beyond the reach of DOE authority, and discussing alternative methods for assuring Occidental's compliance with a hypothetical allocation order which are not relevant to the instant case. *Id.*

### Plaintiffs' Claims

Plaintiffs make two distinct claims. First, DOE has allegedly interpreted various statutes and regulations "to mean that extraterritorial sales of foreign source crude oil by United States sellers, such as Derby, are subject to the Secretary's price regulations and that the exempt 'first sale into U.S. commerce' is the first sale to a United States Buyer, regardless of whether the sale takes place 'in the United States' or whether that buyer imports the goods into the United States." *Complaint,* ¶ 10. This interpretation allegedly results in DOE extending its authority beyond lawful statutory limits. *See Complaint,* ¶ 12.

Plaintiffs' second claim involves what they allege is a procedurally defective retraction by DOE of the *A. Johnson* decision by the decision in *ECI.* According to plaintiffs, *A. Johnson* "established that the foreign purchase and sale of crude oil and other petroleum products by United States corporations which do not import these goods are exempt from the EPAA price regulations." Complaint at ¶ 14. This position was then allegedly retracted by DOE "in *Energy Cooperative, Inc.* and in other regulatory actions taken by defendants...." Complaint at ¶ 17. This retraction is then alleged to be both procedurally flawed and substantively incorrect. *See Complaint* ¶ 18. The major procedural flaws are an allegedly illegal failure to initiate a rulemaking procedure. *Complaint* ¶ 18(c) & (e), and retroactive revocation of a rulemaking pronouncement, *Complaint* ¶ 18(f) & (g).

### Discussion

Both sides agree that a determination of whether the plaintiffs' claims are sufficiently ripe to pose a justiciable controversy should be determined by reference to the principles contained in Supreme Court decisions in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (*Abbott Laboratories*) and its companion cases, *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) and *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). As the Supreme Court described the purpose of the ripeness doctrine in the pre-enforcement context, the doctrine is designed

to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner, supra,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). As applied by the Second Circuit, the ripeness inquiry seems to have four major components: (1) the issue or issues to be determined must be "final agency action" within the meaning of § 10(c) of the APA, 5 U.S.C. § 704; (2) the issues presented must be purely legal; (3) the plaintiff must show some immediate hardship if judicial review is withheld; and (4) judicial review should expedite rather than hinder the functioning of the agency involved. *See Central Hudson Gas and Electric Corp. v. U. S. Environmental Protection Agency,* 587 F.2d 549 (2d Cir. 1978) (*Central Hudson Gas*).

As mentioned above, plaintiffs have two basic claims. The first claim is a broad attack on the alleged efforts of DOE to extend the reach of oil price regulations to purchases and sales of crude oil outside the borders of the United States. The second claim is a procedural and substantive attack on a recent decision of the DOE Office of Hearings and Appeals, *ECI, supra.* The court proposes to discuss these claims in reverse order. Moving immediately to the second claim will provide an opportunity to consider the effect of the *ECI* decision. This in turn will enable the court to focus initially on what is really the core of the present controversy, whether DOE has taken any action sufficiently "final" with respect to plaintiffs to serve as the basis for a justiciable controversy.

■ With respect to plaintiff's second claim it may initially be observed that there is obviously no agency action in *ECI* which is sufficiently final with respect to plaintiffs to meet the requirements of *Abbott Laboratories.* Admittedly, the finality re-

quirement must be applied in "a pragmatic way," but no amount of pragmatism can convert *ECI* into a final DOE action with respect to extraterritorial application of oil pricing regulations. *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. at 1515. Such an allegation cannot survive a reading of the *ECI* decision itself. As previously described at some length, DOE was careful to preface any discussion of jurisdiction over foreign oil sales with the statement that no resolution of jurisdictional issues was necessary. *Energy Cooperative, Inc., supra,* 5 DOE at p. 85,150. Such resolution was unnecessary because DOE decided not to issue the allocation order which would have necessitated a final resolution of its jurisdiction. *Id.* In fact, the *ECI* decision begins a discussion of the reach of DOE pricing regulations by observing "that the EPAA [may] *not* grant DOE jurisdiction over a wholly foreign transaction." *Id.* (emphasis added).

The parties have spent considerable effort arguing over whether DOE has taken any action which is final with respect to *Derby.* Defendant contends that only the parties to *A. Johnson* and *ECI* could have been affected by those two decisions. Plaintiffs respond that it is sufficient if "an agency's actions indicate that it has adopted a fixed and definite position, at an authoritative level, ... irrespective of the institution of administrative proceedings." *Plaintiffs' Supplemental Memorandum* at p. 10. Conceptually, plaintiffs are correct. There are circumstances where an agency's declaration of a certain position or interpretation can be considered final agency action without a specific enforcement proceeding. *See, e. g., Standard Oil Co. v. DOE,* 596 F.2d 1029, 1039 (Em.App.1979) (Federal register notice from FEA announcing interpretation of recently promulgated rule treated as final agency action). Whether the instant case present such a situation with respect to plaintiffs' first claim will be discussed at some length below. Plaintiffs' second claim is not justiciable because it attempts to take a hypothetical OHA discussion about a particular complex factual situation and con-

vert it into final agency action having general applicability in the oil industry. Such an attempt cannot survive an actual reading of the *ECI* decision. *ECI* not only takes no final action with respect to plaintiffs, it also fails to take any final action with respect to anyone else insofar as DOE's jurisdiction over foreign oil sales is concerned. The court will now turn its attention to plaintiffs' first claim for relief.

■ Plaintiffs' first claim amounts to a request for a declaratory judgment "that defendants lack authority to regulate the prices charged by Derby in sales of crude oil that take place outside the United States." *Complaint*, at ¶ 7. Initially it must be noted that the justiciability of such a request at this point is clearly related to the disposition of plaintiffs' second claim. Plaintiffs' second claim was obviously not ripe in light of the finding that the *ECI* decision did not constitute final agency action. If *ECI* was not final agency action, then plaintiffs are reduced to relying upon the *A. Johnson* decision for establishing DOE's position on foreign oil sales. Yet Plaintiffs have also stated in their moving papers that "the *A. Johnson* opinions can be regarded as fitting within the scope of the Congressional mandate, since only imports are controlled." *Plaintiffs' Memorandum of Law* at p. 27.

It is also inaccurate to simply address the allegations in plaintiffs' first claim. Plaintiffs allege *inter alia* that DOE has attempted to extend the "first sale" exemption in 10 CFR 212.2(b) to "the first sale to a United States buyer, regardless of whether the sale takes place 'in the United States' or whether that buyer imports the goods into the United States." *Complaint* at ¶ 10. Yet in their moving papers, plaintiffs admit that *A. Johnson* created a *presumption* that the first sale to a U.S. domiciled corporation was intended for importation to the United States. *See Plaintiffs' Memorandum* at p. 25. This presumption would then generally result in "the last transaction prior to actual importation" being treated as "the exempt first sale into United States commerce." *Id.* Thus, plaintiffs are apparently relying upon some combination of *ECI*

and *A. Johnson* to support their allegation that DOE has attempted to treat foreign oil sales as the first sale into United States commerce "regardless of . . . whether that buyer imports the goods into the United States." The *A. Johnson* decision, as plaintiffs themselves admit, cannot be read by itself to extend DOE jurisdiction to sales without regard to whether the oil bought abroad is imported into the United States.

Accordingly, for purposes of examining the justiciability of plaintiffs' first claim, the court will construe plaintiffs' first claim as alleging the following: (1) DOE has impermissibly attempted to extend its regulations to apply in any fashion to "extraterritorial sales of foreign source crude oil by United States sellers," and (2) DOE has impermissibly attempted to extend the "first sale" exemption to sales past the sale in which a particular covered product is actually imported into the continental United States. Thus phrased, plaintiffs' first claim constitutes an attempt to place all of its foreign sales of crude oil beyond the reach of DOE's price regulations. As described below, such an effort is not currently justiciable because it fails at least three, and arguably all four, of the *Abbott Laboratory* tests for determining ripeness.

Plaintiffs' most resounding failure is their inability to establish "that 'the impact of the [agency action] . . . is sufficiently direct and immediate as to render the issue appropriate for judicial review.'" *Central Hudson Gas & Electric Corp. v. United States E. P. A.*, 587 F.2d 549 (2d Cir. 1978) *quoting Abbott Laboratories v. Gardner, supra*, 387 U.S. at 152, 87 S.Ct. at 1517. As previously mentioned, the President prospectively repealed the same regulations now in dispute by Executive Order on January 28, 1981. Thus the so called "dilemma hardship" which occurs when a party must choose between costly compliance or serious civil and criminal penalties is not present here by definition. *See Abbott Laboratories v. Gardner, supra*, 387 U.S. at 152–54, 87 S.Ct. at 1517–18. If any of plaintiffs' sales of oil abroad are to be regulated, they will have to be sales which have already

occurred. In response plaintiffs argue that the President's Executive Order has been challenged in *Metzenbaum v. Edwards*, 510 F.Supp. 609 (D.D.C.1981) and may be struck down. However, plaintiffs have cited no authority for the proposition that dilemma hardship may be based upon the prospective reinstatement of a previously rescinded regulation. The dearth of such authority is not surprising. If plaintiffs were correct, this court would have to inevitably consider the merits of *Metzenbaum v. Edwards, supra*, to determine whether there is any likelihood that DOE's oil pricing regulations will be revived. Such an exercise is clearly inappropriate. As the law currently stands, plaintiffs are *a priori* incapable of demonstrating the existence of "a Hobson's" choice between costly compliance ... or serious sanctions for non-compliance." *Central Hudson Gas & Electric Corp. v. United States E. P. A., supra*, 587 F.2d at 559.

◼ Next, plaintiffs suggest that sufficient immediate hardship may be found here in the same way as those cases where an agency is acting either without jurisdiction or in violation of a specific statutory or constitutional constraint on its authority. *See Central Hudson Gas & Electric Corp. v. United States E. P. A., supra*, 587 F.2d at 559. Plaintiffs are legally correct. The Second Circuit has recognized that sufficient immediate hardship to fulfill the requirements of *Abbott Laboratories* may be found in cases where an agency's actions have exceeded its jurisdiction or a specific limitation on agency action. However, the Second Circuit's recent formulation of this concept in *Central Hudson Gas, supra*, relied upon by plaintiffs, requires certain additional factors which are not present in the instant case. The Second Circuit stated:

> Another type [of hardship] is the type involved here, where the challenging party argues that the agency is acting without jurisdiction or in violation of a specific limitation on its power. In such cases, the hardship arises in part because the challenging party is being required to defend a proceeding that may later be

declared a nullity. Standing alone, however, this is not enough to justify immediate review. It is well-established that the mere trouble and expense of defending an administrative proceeding is insufficient to warrant judicial review of the agency's action prior to the conclusion of the administrative proceeding.

> ... Other factors must be present in addition to this injury before judicial review will be considered appropriate. Such other factors may include the implications of the agency action on important public interests, ... the impact of the action on the industry involved, ... the disruptive effect of a subsequent declaration that prior proceedings were defective or void and that new proceedings must be held, ... the duplication and waste of putting off a decision which must inevitably be made by the courts, ... and the extent of the waste of governmental resources. ...

587 F.2d at 559–560. (citations omitted)

In the instant situation plaintiffs are not "being required to defend a proceeding that may later be declared a nullity" because no such proceeding exists. In sharp contrast, the petitioners in *Central Hudson Gas* were four utility companies who were already involved in adjudicatory hearings before the EPA. 587 F.2d at 553. The case concerned whether EPA possessed jurisdiction to engage in those self-same hearings. 587 F.2d at 555–557. While plaintiffs are currently the subject of a DOE audit, this audit cannot be interpreted as the initiation of an enforcement proceeding. DOE enforcement proceedings are initiated by the issuance of a "Notice of Probable Violation" (NOPV), and no NOPV has issued against plaintiffs. See 10 C.F.R. §§ 205.190 *et seq.*

Plaintiffs' reliance on *National Distillers and Chemical Corp. v. DOE*, 498 F.Supp. 707 (D.Del.1980) (*National Distillers*) as support for their attempt to characterize DOE's audit as an enforcement proceeding is misplaced. The court in *National Distillers* did equate investigations and enforcement proceedings for purposes of ruling that neither action by DOE deprived DOE

of its discretionary authority to refuse to issue a general counsel's interpretation requested by plaintiff. *See* 498 F.Supp. at 720–21. The decision cannot be read as holding that merely submitting to an investigation is sufficient to establish hardship for purposes of ripeness. In fact, Chief Judge Latchum explicitly refused to reach the question of hardship since he found the claims nonjusticiable "because ... the essential requirement of final agency action [was] lacking." 498 F.Supp. at 719.

Moreover, it should also be noted that the Second Circuit's decision in *Central Hudson Gas, supra,* requires "[o]ther factors ... *in addition*" to having to defend an administrative proceeding for which there is no jurisdiction. 587 F.2d at 559 (emphasis added). Plaintiffs do not even attempt to offer any additional reasons why they are suffering hardship which also has the sort of broader societal or economic significance apparently required by the Second Circuit. *See* 587 F.2d at 559–560 (and cases cited therein).

Finally, plaintiffs argue that the hardship component of the *Abbott Laboratories* test is met regardless of whether there is a choice between compliance and noncompliance or agency action beyond the agency's jurisdiction or authority as long as there is simply sufficient "negative impact" on plaintiffs. In support of this proposition plaintiffs have cited a number of cases which are clearly distinct from the present situation. Upon examination, the cited cases turn out to involve immediate and tangible harm occurring at the time the case was decided and continuing into the future.[7] As previously mentioned, if DOE does proceed to enforcement against plaintiffs, the enforcement action could only be based on oil sales which have already taken place. There is simply no current, tangible

and potentially ongoing harm currently being suffered by plaintiffs.

The second basic *Abbott Laboratories* criterion not met in this case is the requirement of agency action which is "final" for purposes of 5 U.S.C. § 704. Plaintiffs argue strenuously that the current DOE position on foreign oil sales constitutes final agency action. This court disagrees. This disagreement is best explained by discussing the cases cited by plaintiffs, because the factual distinctions between those cases and the instant situation serve to illustrate the lack of final agency action in this case.

Plaintiffs place primary reliance on three cases in which two separate district courts invalidated the FEA's interpretation of certain regulations governing recovery by oil refiners of certain production cost, and were affirmed by the Temporary Emergency Court of Appeals. *See Standard Oil Co. v. DOE,* 596 F.2d 1029 (Em.App.1978), *affirming Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239 (D.Del.1977) and *Standard Oil Co. v. DOE,* 440 F.Supp. 328 (N.D.Ohio 1977) (collectively referred to as *Standard Oil Co.*). In *Standard Oil Co.,* FEA, and its successor, DOE, instituted exception proceedings designed to allow individual refiners to seek exception relief from the particular oil pricing regulations at issue. However, in the same Federal Register notice announcing the exception hearings, DOE also stated it would not alter or reconsider its basic interpretation of the pricing regulations at issue. The Temporary Emergency Court of Appeals concluded that the situation just described constituted final agency action because "[u]nless this Court takes jurisdiction, these legal questions will be left unadjudicated while the regulations will still apply with *full force and effect.*" 596 F.2d at 1039 (emphasis added).

---

**7.** *See, e. g., Standard Oil Co. v. DOE,* 596 F.2d 1029, 1038–39 (Em.App.1978) (challenged regulations immediately invalidated certain prior transactions and DOE refused to reexamine the challenged regulations in enforcement proceedings); *State of Louisiana v. DOE,* 507 F.Supp. 1365, 1373 (W.D.La.1981) (DOE's administrative interpretation of certain regulations resulted in pending monetary claims against State of

Louisiana by oil producers which refunded royalty payments to state under protest); *Dow Chemical, USA v. Consumer Product Safety Commission,* 459 F.Supp. 378, 387 (W.D.La. 1978) (Consumer Product Safety Commission's classification of suspected carcinogens would have immediate "compelling impact" on plaintiffs).

In the instant case we have one agency interpretation, *A. Johnson,* rendered at the request of a single refiner. The decision establishes a rebuttable presumption about how certain offshore oil transactions will be treated. There is no agency action which has any "effect" on plaintiffs. In *Standard Oil Co.* DOE's refusal to reconsider its interpretation of oil pricing regulations applicable to a period of time in the past effectively made all the completed sales not done in accordance with the interpretation illegal. Here DOE's action in *A. Johnson* had no effect at all on plaintiffs' prior oil sales. Its interpretation *cannot* have any effect on plaintiffs' previous oil sales until an enforcement proceeding results in a finding that any given sale by plaintiffs was in fact made for purposes of import into this country.

Lack of an immediate effect on plaintiffs also serves to distinguish this case from the other two District Court decisions relied upon by plaintiffs, *Northern Natural Gas v. DOE,* 464 F.Supp. 1145 (D.Del.1979) (*Northern Natural Gas*) and *Pennzoil Co. v. DOE,* 466 F.Supp. 238 (D.Del.1979) (*Pennzoil Co.*). In *Pennzoil* a DOE interpretation of oil pricing regulations resulted in *Pennzoil* being in "daily violation" for which it was "subject to substantial penalties." 466 F.Supp. at 242. In *Northern Natural Gas* the agency action complained of consisted of "regulations promulgated after notice and comment procedures" which were "binding and enforceable against plaintiffs." 464 F.Supp. at 1154. Citing one of the lower court opinions in *Standard Oil Co., supra,* the court in *Northern Natural Gas* found that DOE's action in promulgating the regulations at issue was final because "legal questions will be left unadjudicated while the regulations will still apply with full force and effect." 464 F.Supp. at 1155. No such final action exists in the instant case. Plaintiffs here are not subject to fines or penalties. DOE's creation of a rebuttable presumption in *A. Johnson* concerning certain foreign oil sales has so far had no impact on plaintiffs at all.

The remaining *Abbott Laboratories'* criteria are: (1) whether the issues presented are purely legal, and (2) whether pre-enforcement review will impede or enhance the agency's enforcement function. The court feels that in the instant case these two factors are related and they will be discussed together. The extent to which an effective decision would necessitate factual inquiries is clearly related to whether a decision at this point could potentially impede DOE's enforcement efforts. This potential is a result of the virtually complete absence of facts on this record about plaintiffs' oil sales abroad. Certainly the present controversy can be framed in such a way that the issues involved are almost purely legal. For example, stated most broadly, plaintiffs appear to attack DOE's authority to ever examine foreign oil sales, *even for purposes of determining whether jurisdiction exists* over those sales. *See Plaintiffs' Memorandum of Law* at fn. p. 24.

Stated this broadly, plaintiffs' claims are obviously legal, and so at least one of the *Abbott Laboratories'* criteria for ripeness would be met. The result of such a broad phrasing, however, would be to greatly increase the chances that any decision by this court on the merits would do more harm than good. As the Supreme Court has recognized, "judicial appraisal . . . is likely to stand on a much surer footing in the context of a specific application of . . . [a] regulation that could be the case in the framework of . . . [a] generalized grievance." *Toilet Goods Association v. Gardner, supra,* 387 U.S. at 164, 87 S.Ct. at 1524. Forcing DOE to defend this lawsuit on the merits will result in both DOE and this court being forced to function in a factual vacuum.

As graphically illustrated by the descriptions of the facts in *A. Johnson* and *ECI* which began this opinion, the international marketing of crude oil involves transactions of truly byzantine complexity. The statute at the heart of this controversy, the Emergency Petroleum Allocation Act, extends, *inter alia,* to "all crude oil . . . *imported into* the United States." 15 U.S.C. § 753(a) (emphasis added). This action is therefore

really about a construction of the word "imported." While this court obviously *could*, as plaintiffs suggest, decide in the abstract whether the presumption found in *A. Johnson* is consistent with the word "imported" in 15 U.S.C. § 753(a), this court declines to do so. An appreciation of the potential factual inquiry necessary to properly construe the term "import" in the context of international oil trading causes this court to conclude that "we are unwilling to disrupt [the] administrative process when 'no irremediable adverse consequences flow from requiring a later challenge'" to the agency position now under attack. *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C.Cir.1978) quoting *Toilet Goods Association v. Gardner, supra*, 387 U.S. at 164, 87 S.Ct. at 1524.

## CONCLUSION

For the reasons just given, defendant's motion to dismiss is granted. Plaintiffs' cross motion for summary judgment is denied as moot.